In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-1083

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CAREY PORTMAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 64—**Blanche M. Manning,** *Judge.*

ARGUED SEPTEMBER 11, 2009—DECIDED MARCH 22, 2010

Before BAUER, ROVNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* A jury found Carey Portman
guilty of multiple counts of mail fraud, wire fraud, bank
fraud, and possessing and creating falsely altered checks.
After the application of various sentencing enhance-
ments, Portman was sentenced to 60 months' imprison-
ment, which was at the low end of the applicable guide-
line range of 57-71 months. Following a limited remand
due to a miscalculation of the number of victims, the

district court resentenced Portman to 48 months' imprisonment, again a sentence near the low end of his new 46-57 months guideline range. On appeal, Portman argues his sentence is substantively unreasonable because the district court did not reduce Portman's sentence due to his diminished capacity and lack of success of his criminal endeavors. Because there is no causal link between his alleged diminished capacity and his crime, and because the district court properly exercised its discretion in determining the seriousness of Portman's intended crimes, we affirm Portman's sentence.

## I. BACKGROUND

According to Carey Portman, he is an important Panamanian ambassador and businessman. Sometimes, he is also the lucky inheritor of a Nigerian fortune. In 2003, armed with purported Nigerian inheritance documents, Portman went to a Citibank branch office in Chicago, Illinois, and demanded a loan of $102,824 in order to pay the inheritance tax and receive his inheritance. Citibank's branch manager attempted to convince Portman that this was a well-known scam, but he was unsuccessful and Portman's account was closed. Portman then attempted this same scheme with several individual businessmen. Though largely unsuccessful, Portman did receive $50,000 from one man he had known for four years.

When he acted as the Panamanian ambassador-businessman, Portman would tell managers at Chicago banks that they could expect him to do a lot of business with the bank. He would then deposit a large, forged check and

attempt to immediately withdraw a portion of the money. In September 2003, Portman presented for deposit a $125,000 cashier's check, which had originally been issued for $20, payable to "Hon. Carey Portman" at the Oak Brook Bank in Chicago. Oak Brook Bank credited Portman's account, allowing him to withdraw over $81,000 before the initial deposit was reversed. By reversing transfers and stopping payment, the bank incurred an actual loss of $29,859.81. Portman attempted a variation of this scheme at several other Chicago banks. In November 2003, Portman opened an account at North Community Bank, again identifying himself as an important ambassador to Panama. A few days later, Portman presented for deposit a fraudulent $155,000 check made payable to the "Hon. Carey Portman." Portman attempted to immediately withdraw some money, but the bank refused to comply because the check was not issued by a local bank. North Community Bank eventually informed Portman that the check was counterfeit and closed his accounts. In December 2003, Portman unsuccessfully attempted to cash a $100,000 counterfeit cashier's check at Washington Mutual. That same month, "ambassador" Portman opened an account at TCF Bank. A few weeks later, he deposited a fraudulently altered $128,000 check made payable to "Carey Portman." TCF bank allowed Portman to withdraw $2,000 before learning the check was falsely altered. After issuing a stop payment order on Portman's checks, TCF's actual loss totaled $1,239.51.

Portman was charged with multiple counts of mail fraud, wire fraud, bank fraud, and possessing and

uttering falsely altered securities, in violation of 18 U.S.C. §§ 513(a), 1341, 1343, and 1344. A jury convicted Portman of all counts. At sentencing, the presentence investigation report ("PSR") calculated the base offense level at seven, added 16 levels for an intended loss of over $1 million, and two levels for involvement of more than 10 victims, for a total offense level of 25 and a sentencing guideline range of 57-71 months. Portman asked for a sentence below his guideline range based on a dispute over the number of victims, the actual loss, and his diminished capacity due to an alleged organic brain disorder.

After applying the 18 U.S.C. § 3553(a) sentencing factors, the district court declined to impose a below-guideline sentence. The judge balanced the seriousness of the offense, various letters of recommendation on Portman's character, the risk of recidivism and the need to protect the public from Portman in imposing a sentence of 60 months' imprisonment. After the court sentenced Portman, the government conceded it had miscalculated the number of victims. The parties filed a joint motion for limited resentencing to correct the number of victims, and Portman was resentenced to 48 months' imprisonment. During this limited resentencing, the district court did not revisit arguments for a reduced sentence based on intended loss amount or diminished capacity.

On appeal, Portman makes two arguments. First, he argues that the district court abused its discretion by failing to resolve the issue of Portman's diminished capacity and not reducing Portman's sentence due to his

diminished capacity. Second, he argues that the district court abused its discretion by not reducing Portman's sentence on the theory that the loss calculation of over $1 million overstated the seriousness of his offense.

## II. ANALYSIS

### A. Diminished Capacity

Portman argues that the district court should have imposed a below-guidelines sentence because Portman suffered from a diminished capacity that substantially contributed to the commission of the offense. Prior to the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), a defendant's diminished capacity could serve as the basis of a downward departure from a guideline range. *See* U.S.S.G. § 5K2.13. Of course, *Booker* rendered the guidelines advisory and departures became obsolete. *United States v. Blue*, 453 F.3d 948, 952 (7th Cir. 2006). Post-*Booker*, sentencing courts have the discretion to decide that a sentence outside the guideline range is appropriate. *Id.* Where a district court has properly calculated the guideline range, we review sentences for reasonableness, using an abuse of discretion standard. *United States v. Panaigua-Verdugo*, 537 F.3d 722, 727 (7th Cir. 2008). The district court judge is given great deference in balancing the § 3553(a) sentencing factors, and a sentence that falls within a properly calculated guideline range is presumptively reasonable. *Id.* However, when a defendant has raised "nonfrivolous reasons to impose a different sentence, the district court

must focus on the § 3553(a) factors as they apply to [that defendant] in particular." *United States v. Miranda*, 505 F.3d 785, 796 (7th Cir. 2007). It must provide enough explanation so that someone familiar with the case would understand why the court rejected the argument. *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005).

Diminished capacity is a ground of "recognized legal merit" for seeking a lesser sentence, *Miranda*, 505 F.3d at 792, and we have found abuse of discretion when judges have not considered or addressed uncontested evidence of diminished capacity. *See, e.g., United States v. Williams*, 553 F.3d 1073, 1084 (7th Cir. 2009); *Miranda,* 505 F.3d at 792. In relevant part, the diminished capacity policy statement reads:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense. U.S.S.G. § 5K2.13[1]

---

[1] Diminished capacity is further defined in the following application note:

> "Significantly reduced mental capacity" means the defendant, although convicted, has a significantly

(continued...)

So if there is a nonfrivolous dispute about a defendant's mental capacity, a sentencing court should address the issue, making a finding on whether the defendant suffers from diminished capacity and whether that diminished capacity contributed substantially to the commission of the crime. This is true of any disputed fact that may be decisive in sentencing. Fed. R. Crim. P. 32(i)(3); *see United States v. Dean*, 414 F.3d 725, 730 (7th Cir. 2005) ("A judge who thinks that a particular contested characteristic of a defendant may be decisive to the choice of sentence, such as the defendant's mental or emotional state, must resolve the factual issue. . . .").

Here, the district court made no such finding, stating there was no need to resolve whether Portman has ever suffered from diminished capacity because Portman had not linked the diminished capacity to § 3553(a) factors which would show that he should receive a lower sentence. Furthermore, the district court stated that a finding of diminished capacity would, if anything, impact sentencing as a potentially aggravating factor. In its sentencing order, the district court focused almost entirely on the risks of recidivism, stating that a person who cannot appreciate the criminality of his conduct will be "*more* rather than *less* likely to be a recidivist,

---

[1] (...continued)
impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful.

a factor under § 3553(a) that would favor a longer sentence." In reaching this conclusion, the district court heavily relied on *United States v. Beier*, 490 F.3d 572 (7th Cir. 2007), a child pornography case in which the defendant argued that § 3553(a) required a below-guidelines sentence due to the defendant's own abuse as a child and low IQ. There, we held that a defendant must show why personal characteristics act as a mitigating, not potentially aggravating, factor in a case where the defendant may not be able to control his sexual impulses. *Beier*, 490 F.3d at 574. This is true of many personal characteristics, such as age. A young defendant might argue that his age is a mitigating factor if the defendant has strong ties to a supportive family, but age could also be used as an aggravating factor if the young defendant already has an extensive criminal history. *See United States v. Jackson*, 547 F.3d 786, 794-95 (7th Cir. 2008).

Diminished capacity and personal characteristics increasing risks of recidivism, however, are two different issues. To use a finding of diminished capacity as an aggravating factor for sentencing purposes misunderstands the relationship between U.S.S.G. § 5K2.13 and 18 U.S.C. § 3553(a). The principal purposes of a criminal sentence are to further goals of retribution, deterrence, and incapacitation. *See United States v. Dyer*, 216 F.3d 568, 570 (7th Cir. 2000). The sentencing guidelines and the § 3553(a) factors ensure that judges consider these purposes when sentencing defendants. A person who cannot understand the wrongfulness of his actions or control his actions due to a reduced mental capacity is

less culpable and less able to be specifically deterred than a person who is not mentally ill, and a long sentence for such a defendant may not serve the purposes of punishment. *Id*. For these reasons, § 5K2.13 gives judges the discretion to reduce sentences for defendants suffering from diminished capacity. A finding of diminished capacity could also lead to the conclusion that the most effective way of incapacitating the defendant and preventing him from committing further crimes is to provide needed medical care outside a prison setting. *See Miranda*, 505 F.3d at 793. The potentially greater risk of recidivism in a defendant with diminished capacity can be addressed through different means such as psychological treatment or monitoring. It is a misunderstanding of diminished capacity to suggest that because reduced mental capacity would make recidivism more likely, an increased sentence would be necessary. Of course, it could also be that a district court could find diminished capacity but choose not to reduce a sentence. For example, a court could find that the defendant would remain dangerous after treatment. *Id.* Or, the court could rule that any diminished capacity did not contribute to the commission of the offense. *United States v. Frazier*, 979 F.2d 1227, 1230 (7th Cir. 1992).

But the potential impact of a diminished capacity finding in Portman's case is not an issue we need to reach here. Even if Portman is correct that the district court's lack of a finding was error and its discussion of diminished capacity's impact on sentencing faulty, any error was harmless. Based on the evidence submitted to the court, the district court could not have found that

any diminished capacity Portman allegedly suffered substantially contributed to his commission of these crimes.

Pre-trial, Portman's attorney requested a psychiatric examination to determine whether Portman was sane. Dr. Nelson Borelli, a psychiatrist who testified as an expert witness in psychiatry in forty to fifty Illinois state court cases, was appointed to conduct this examination. Between December 2004 and November 2005, Dr. Borelli spent forty-five hours evaluating Portman and reviewing his medical history. In his November 7, 2005 report ("initial report"), Dr. Borelli stated his opinion was that Portman had a defective "emotional/cognitive system." He also indicated that this opinion was "speculative" because of Portman's unwillingness to "step out of what appears to be his dream life and spell out his internal world of depression and despair." He noted that Portman exhibited no outward signs of psychiatric dysfunction or disease and that testing revealed no mental defect or disease. Dr. Borelli did not speak to anyone else in Portman's life or to investigators about the charges, and did not substantiate any claims Portman made with external information. Then, in 2007, Dr. Borelli performed a three-hour psychiatric examination on Portman in preparation for the sentencing hearing. In this two-page report, he concluded that Portman's mental condition met the legal standard of diminished capacity, as Portman had committed the offense while suffering from a "cognitive disorder" that substantially contributed to the commission of the offense. There was no specific mention of how the diminished capacity was connected to Portman's specific actions underlying the criminal charges.

At the sentencing hearing, the government stipulated that Dr. Borelli was a qualified medical expert in the field of psychiatry, and both his reports were submitted as evidence. Dr. Borelli also testified that Portman had a cognitive disorder, potentially linked to an organic brain injury or lesions in the brain. Dr. Borelli stated his "best guess" was that this brain defect was linked to Reye's Syndrome, which Portman claimed to have been diagnosed with when he was twelve years old. No independent medical report confirmed Portman's affliction with Reye's Syndrome. Dr. Borelli referred Portman to two different neurologists, but they never found any injury or lesions in Portman's brain. When pushed on this point during his testimony, Dr. Borelli stated that his final diagnosis of "cognitive disorder" was a result of Portman's attorney wanting Dr. Borelli to "put something there" with respect to diminished capacity and that "cognitive disorder is as close as you can come to anything." Further, Dr. Borelli stated he may have first learned the definition of diminished capacity when he met with Portman's attorney before his 2007 three-hour examination of Portman.

Even if the district court could have relied on Dr. Borelli's opinion that Portman had a significantly reduced mental capacity at the time of his offense, a legal diminished capacity finding also requires a causal link between the mental capacity and the crime. *Jackson*, 547 F.3d at 796. No such connection was made here. In *United States v. Frazier*, we held that a connection between mental capacity and the actions underlying the criminal offense could not be assumed. 979 F.2d at

1230. Dr. Borelli needed to analyze the specific charges Portman was convicted of committing and relate Portman's actions to his mental capacity, but he did not do that. In fact, Dr. Borelli seemed unclear as to what crimes Portman committed. He stated that while he had discussed the charges with Portman's initial attorney, he had little to no understanding of the details of Portman's charges since he did not think it was important to know what Portman allegedly did. In his initial report, he inaccurately referred to the charges as "internet fraud accounts," and at the hearing, he stated that he didn't have the capacity or time or the "disposition or the ability to read all these legal documents." Dr. Borelli further stated that he was not concerned about the legal definition of diminished capacity, testifying that he did not "spend much time trying to understand that legal thing" as "the legal language is not always clear."

Based on Dr. Borelli's testimony and two reports, the district court could not have found that Portman's alleged diminished capacity substantially contributed to the crimes committed. Dr. Borelli derived his understanding of the causal link between Portman's diminished capacity and his crimes based only on information Portman provided. He did not confirm Portman's account of his crimes and did not seem to fully understand the criminal charges. *See Frazier*, 979 F.2d at 1230. Given the lack of a causal link between Portman's purported mental capacity and the crimes, there was no reversible error in the district court's failure to explicitly determine whether Portman had a significantly reduced mental capacity. We conclude that Portman's unproven mental

illness, the lack of evidence of a causal link between any illness and the crimes committed, and the other relevant factors, did not compel a sentence below the advisory guidelines range.

### B.  Loss Calculation

Next, Portman argues that the district court abused its discretion when it refused to reduce his sentence based on the difference between the intended loss of his schemes and the actual loss. Again, we review Portman's sentence for reasonableness under an abuse of discretion standard. *Jackson*, 547 F.3d at 792. In calculating sentence enhancements based on economic loss, "loss" is the greater of actual loss or intended loss. U.S.S.G. § 2B1.1(b)(1) cmt. n.3(A). Intended loss is the pecuniary harm intended to result from the offense and includes harm that would have been impossible or unlikely to occur. *Id.*; *see also United States v. Kimoto*, 588 F.3d 464, 496 n.37 (7th Cir. 2009). Portman does not dispute the calculation of the intended loss. He argues instead that the intended loss overstates the seriousness of the offense and so, the district court judge should have exercised her discretion to set a below-guideline sentence. A court can consider the amount of variance between the intended loss and the realistic possibility of loss when considering an appropriate sentence. *United States v. Stockheimer*, 157 F.3d 1082, 1091 (7th Cir. 1998). This decision, however, remains in the sentencing judge's wide discretion, and our review may only evaluate the overall reasonableness of the sentence imposed.

Here, the district court judge considered Portman's arguments for a sentence below the advisory guidelines range, but found that the intended loss adequately reflected the seriousness of the offense. The PSR calculated the intended loss amount to be $1,020,825. This calculation is based on Portman's attempts to obtain approximately $512,825 in loans from various individuals and businesses with his Nigerian inheritance scheme and Portman's attempts to obtain $508,000 from various banks through falsely altered and counterfeit checks. Of course, the actual loss suffered was much less: $50,000 from one businessman and $31,099.32 from the banks. Although the judge could have reduced the sentence based on the actual loss amount, she was not required to do so. The judge did not ignore Portman's request for a reduced sentence based on loss calculation; she addressed its merits. In finding a reduced sentence unwarranted, the district court judge emphasized the successes that Portman had in his schemes and found that most of the banks initially accepted his fraudulent checks. The judge gave an adequate and thorough statement of reasons, and took into account the § 3553(a) sentencing factors. Specifically, in relating the seriousness of the offense to the § 3553(a) sentencing factors, the district court judge emphasized how Portman moved from one victim to the next, undeterred by his lack of success. The court's statement of reasons was sufficient "to allow for meaningful appellate review and to promote the perception of fair sentencing." *United States v. Scott*, 555 F.3d 605, 608 (7th Cir. 2009) (quotations omitted). Portman has not rebutted the presumption of reasonableness

attached to his sentence by showing that the sentence is unreasonable when considered against the § 3553(a) factors.

## III. CONCLUSION

Accordingly, we AFFIRM Portman's sentence.