In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 10-1308, 10-1328, 10-1660, 10-1753

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

HAL DURHAM, et al.,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 CR 549—**David H. Coar**, *Judge.*

ARGUED MAY 4, 2011—DECIDED JUNE 28, 2011

Before EASTERBROOK, *Chief Judge,* and FLAUM and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. In July of 2008, defendant-appellants Tony Callion, Hal Durham, Israel Collins, and Sherman Swopes—along with two other individuals—kidnapped Charles Zachary for ransom because he owed Callion drug money. In response to his kidnappers' demands, Zachary said that his girlfriend, Luella Dorenzo, could get the money from the TCF Bank where she

worked. Defendants, unaware that Dorenzo had contacted law enforcement, arranged a ransom drop with her. Shortly after obtaining the money, defendants were arrested. They were charged in a three-count indictment with (1) conspiracy to commit attempted bank robbery of a federally-insured bank, in violation of 18 U.S.C. § 371; (2) attempted bank robbery, in violation of 18 U.S.C. § 2113(a); and (3) knowingly using and carrying firearms during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c). Collins and Swopes pled guilty to Counts Two and Three. Callion and Durham went to trial separately; each was convicted on Counts One and Two, and acquitted on Count Three. All four defendants challenge their sentences, and Callion and Durham challenge their convictions. For the following reasons, we affirm, except as to Swopes's sentence, which appears to have been based in part on a factual misapprehension by the district court. Consequently, we vacate Swopes's sentence and remand the case to the district court for resentencing.

## I. Background

Callion first proposed kidnapping Zachary (who is his cousin) to Daniel Gibbs in June of 2008, explaining that Zachary owed him drug money. According to Gibbs, the original plan was to get a $75,000 ransom, half in drugs and half in cash. Callion and Gibbs again discussed the kidnapping at a Fourth of July barbeque at Durham's house. Natalie Hoisington (Gibbs's girlfriend) and Durham (Gibbs's father) also participated in that conversation,

during which Callion told Gibbs to buy handcuffs and duct tape.

On the evening of July 9, 2008, Callion called Gibbs and told him that the kidnapping would happen that night. At about 9:30 PM, Gibbs, Hoisington, Callion, and Durham met at Durham's house. Callion, Gibbs, and Hoisington went out to find Zachary at around midnight or 1 AM. Along the way, Callion recruited Collins and Swopes to join them. All five went to Zachary's house to wait for him. When Zachary returned, Swopes and Collins abducted and handcuffed Zachary, and put him in the back of the vehicle. The group then drove back to Durham's house, where they planned to hold Zachary. While the others moved Zachary into the house, Gibbs accidentally discharged a shell from the shotgun into the center console of the vehicle.

Zachary was duct taped to a chair in a room off the kitchen; duct tape was wrapped around his head to cover his eyes. Callion and Durham proceeded to use force to threaten and intimidate their hostage. Durham used an unloaded .22 caliber revolver to play "Russian Roulette" with Zachary, hit Zachary in the side of the head with the revolver, fired a gun loaded with .22 caliber low velocity power load ammunition at Zachary's leg, and briefly brought his pit bull into the room to scare Zachary. Callion pulled up on Zachary's toes with a wrench.

Callion knew that Zachary's girlfriend, Luella Dorenzo, worked at a bank. He had relayed that fact to Gibbs in May 2008, and mentioned it to the other defendants in the early hours of July 10th after they abducted Zachary. However,

it was Zachary who, in response to defendants' ransom demands, first told Gibbs that he might be able to get the money from Dorenzo. Gibbs told Callion, Durham, Swopes, and Collins that Zachary said he would call his girlfriend. In response, Callion told Gibbs that Zachary should have Dorenzo get the money out of a safety deposit box. When Gibbs relayed that message, Zachary told him there was no safety deposit box, but that she could "get it from the bank." Gibbs informed the others of this, and Callion said "ok."

With Gibbs's help, Zachary made a number of calls to Dorenzo on his cell phone, but she did not pick up. While trying to reach Dorenzo, Zachary suggested two other possible sources of ransom money—a woman named "Nellie" and a man named "Bob." He placed several calls to each of them early that morning as well. Between 6 and 7 AM, before Zachary first reached Dorenzo, Callion and Durham drove to Nellie's to try and get ransom money from her. They were unsuccessful, but did not return to Durham's house until about 11 AM.

At 7:34 AM Zachary finally reached Dorenzo, who agreed to get the money from the bank. Callion and Durham were not there at that time, but Gibbs and Callion remained in cell phone contact. When Callion learned that Dorenzo had agreed to get the money, he told Gibbs where Dorenzo should drop off the ransom.

At some point that morning, law enforcement arrived at the TCF Bank where Dorenzo worked, and began recording calls between Zachary's cell phone and Dorenzo's cell phone. During one of those calls, Dorenzo explained that

it would be difficult for her to get out of the bank with the money, saying, "I mean, this is a bank. It's hard for me to just walk out of here like that without them noticing something." By the time Callion and Durham returned to the house, Dorenzo still had not gotten the money. Callion instructed Gibbs to tell Dorenzo that they "weren't playing no more," and that 12:30 PM was their last call. Shortly after that call, Dorenzo left the bank with $40,220 in ransom money provided by TCF Bank in a TCF-labeled bag. A tracker device and four $20 pre-recorded bait bills were also in the bag.

Durham retrieved the money. Back at his house, Durham found the tracking device as he divided up the money. Initially, he threw it in the neighbors' yard, but then instructed Hoisington to go get it and get rid of it. When Hoisington went outside, she was stopped by officers. Realizing that the police were there, Callion, Durham, Gibbs, Swopes, and Collins grabbed the money and tried to hide upstairs. They were arrested shortly thereafter.

The following morning, FBI Agent Christopher Crocker interviewed Callion. At Callion's trial, Crocker testified that Callion admitted to planning the kidnapping for ransom, and admitted believing that Dorenzo had a key to the bank vault. According to Crocker, Callion also said that, at one point, they demanded that Dorenzo take all of the money in the bank vault.

Durham also gave a post-arrest interview, during which he admitted to knowing that Zachary was being held in his house, that ransom calls were being made to Zachary's girlfriend, that Zachary's girlfriend worked at the TCF

Bank, and that the ransom amount had reached $40,000. Durham also admitted that he picked up the bank bag containing the money and tried to dispose of the tracking device.

On October 9, 2008, a grand jury returned a three-count indictment against all six participants, charging them with conspiracy to commit attempted bank extortion of a federally-insured bank, in violation of 18 U.S.C. § 371 (Count One); attempted bank extortion, in violation of 18 U.S.C. § 2113(a) (Count Two); and knowingly using and carrying firearms during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c) (Count Three). Gibbs and Hoisington pled guilty and became cooperating witnesses.

Swopes pled guilty to Counts Two and Three on October 8, 2009. On March 12, 2010, he was sentenced to 170 months' imprisonment on Count Two and 120 months' imprisonment on Count Three, to be served consecutively. Collins also pled guilty to Counts Two and Three. On February 1, 2010, he was sentenced to 151 months' imprisonment on Count Two and 120 months' imprisonment on Count Three, to be served consecutively.

Callion and Durham chose to go to trial. Callion successfully moved to sever his trial from Durham's. On October 28, 2009, a jury convicted Durham on Counts One and Two, and acquitted him on Count Three. Durham was sentenced to concurrent sentences of 60 months' imprisonment on Count One and 188 months' imprisonment on Count Two on February 1, 2010. On November 20, 2009, a jury similarly found Callion guilty on Counts One and Two, and

acquitted him on Count Three. On March 5, 2010, Callion was sentenced to concurrent sentences of 60 months' imprisonment on Count One and 240 months' imprisonment on Count Two. All defendants appeal their sentences; Callion and Durham challenge their convictions as well.

## II.  Discussion

### A.  Questioning of Agent Crocker

As discussed below, Callion challenges the sufficiency of the evidence supporting his convictions on Counts One and Two. As part of those challenges, Callion contends that the district court erred in allowing the government to elicit a substantial portion of FBI Agent Crocker's testimony on direct examination by asking leading questions. Callion's counsel did not object to the line of questioning at trial, and therefore this Court's review is for plain error. Under plain-error review, a defendant must show that (1) there was error; (2) it was plain; (3) it affected his substantial rights; and (4) the court should exercise its discretion to correct the error because it seriously affected the fairness, integrity or public reputation of the judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732-35 (1993).

Rule 611(c) of the Federal Rule of Evidence provides that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony," or "[w]hen a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Agent Crocker was neither hostile

nor adverse to the government—indeed, he was a government witness. And the government did not limit itself to developing parts of Crocker's testimony via leading questions; rather, prosecutors used leading questions to elicit the bulk of Crocker's substantive testimony regarding Callion's post-arrest statement.

The government maintains that it asked leading questions to ensure that Agent Crocker did not testify regarding portions of Callion's statement that the district judge had ruled were inadmissible. Specifically, the district court had granted the government's motion *in limine* to admit portions of Callion's statement, not including statements that were inadmissible as self-exculpatory hearsay statements or irrelevant statements. According to the government, it asked leading questions in an effort to avoid violating the motion *in limine*.

We are not persuaded that an agent with more than six years of experience, like Agent Crocker, requires the degree of government guidance that occurred here. In *United States v. Meza-Urtado*, 351 F.3d 301, 303 (7th Cir. 2003), we suggested that the allowance of improperly leading questions will rarely constitute plain error because, in the face of a sustained objection, most lawyers can rephrase a leading question to elicit the desired testimony. However, we recognize that valid concerns regarding the overuse of leading questions exist. *See United States v. McGovern,* 499 F.2d 1140, 1142 (1st Cir. 1974) (noting that leading questions "may supply a false memory" in a friendly witness); *United States v. Durham*, 319 F.2d 590, 592 (4th Cir. 1963) (same); *Stine v. Marathon Oil Co.*,

976 F.2d 254, 266 (5th Cir. 1992) (suggesting that leading questions may inhibit the jury's ability to "make credibility determinations" if permitted in "controverted substantive areas"). In light of those concerns, the government should resist crossing the line from developing a witness's testimony to effectively testify for that witness. *See Stine*, 976 F.2d at 266.

But even if there may be the rare case in which leading questions result in prejudice to a defendant, this is not that case. Crocker's typed report of the post-arrest interview appears in the record, and is entirely consistent with his testimony. Therefore, we have no doubt that if Callion's counsel had timely objected, the prosecutor could have rephrased the questions to elicit the same testimony from Agent Crocker.

## B. Callion and Durham's Sufficiency of the Evidence Claims

### 1. Count Two

Both Callion and Durham contend that the government presented insufficient evidence to support a guilty verdict on Count Two, attempted bank extortion in violation of 18 U.S.C. § 2113(a). The relevant portion of U.S.C. § 2113(a) states:

> Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another, or obtains or attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, manage-

ment, or possession of, any bank . . . [s]hall be fined
under this title or imprisoned not more than twenty
years, or both.

According to Callion and Durham, there is no evidence
that they knew the ransom money belonged to the bank,
and therefore no reasonable jury could have found that
they possessed the requisite intent—namely, the intent to
"obtain by extortion . . . money . . . belonging to, or in the
care, custody, control, management, or possession of, any
bank." 18 U.S.C. § 2113(a).[1]

---

[1] The parties presume that attempted bank robbery under
§ 2113(a) is a specific intent crime because, at common law,
attempt offenses carry a requirement that the defendant specifi-
cally intend to commit the underlying crime. *United States
v. Coté,* 504 F.3d 682, 687 (7th Cir. 2007). But § 2113(a) contains
no explicit *mens rea* requirement, and it is well established that
bank robbery under § 2113(a) is a general intent crime, not a
specific intent crime. *See Carter v. United States,* 530 U.S. 255, 269-
70 (2000); *United States v. Fazzini,* 871 F.2d 635, 641 (7th Cir.
1989). Neither this Court nor the Supreme Court has decided
whether specific intent is an essential element of attempted bank
robbery in violation of § 2113(a); our sister circuits are split on
the issue. *Compare United States v. Darby,* 857 F.2d 623, 626 (9th
Cir. 1988) (attempted bank robbery under § 2113(a) requires the
specific intent to take the property by force, violence or intimi-
dation), *with United States v. Johnston*, 543 F.2d 55, 57-58 (5th Cir.
1976) (attempted bank robbery under § 2113(a) is not specific
intent crime) and *United States v. Armstrong*, 116 F.3d 489 (10th
Cir. 1997) (unpublished) (same). We need not decide the issue to
address defendants' argument here.

(continued...)

Callion and Durham maintain that the evidence demonstrates that they simply intended to steal money from Zachary. While Callion and Durham concede that eventually they knew the money was coming from the bank, they contend that the government failed to show that they knew that it was the bank's money, as opposed to Zachary's bank deposits. Moreover, they maintain that they learned that the ransom was coming from the bank after the demand had been made, and therefore after the crime of extortion was complete.

---

[1]  (...continued)

In order to convict a defendant of a general intent crime, the government must prove only that the defendant "consciously and voluntarily [engaged] in the proscribed conduct." *United States v. Bates*, 96 F.3d 964, 967 (7th Cir. 1996). The conduct at issue here is "attempt[ing] to obtain by extortion . . . money . . . belonging to, or in the care, custody, control, management, or possession of, any bank." 18 U.S.C. § 2113(a). Specific intent crimes require additional proof of the defendant's "intent to effectuate a particular result." *Bates*, 96 F.3d at 967. Here, a specific intent requirement would require the additional proof that defendants intended to steal the money. *Carter*, 530 U.S. at 268-69.

Defendants' contend that the evidence is insufficient to show that they knew the money belonged to the bank. That argument relates to their general intent—whether they "possessed knowledge with respect to the *actus reus* of the crime." *Id.* at 268. Therefore, the distinction between specific and general intent is not relevant here.

This court has described the task of successfully challenging a conviction based on insufficient evidence as "a daunting one, as the standard of review . . . is necessarily rigorous." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003). If we conclude that any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime beyond a reasonable doubt, then the conviction must be upheld. *Id.* Only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt will a conviction be overturned. *Id.*

We have little trouble concluding that Callion's challenge fails. Agent Crocker testified that Callion admitted in his post-arrest statement to knowing that, at one point, Zachary told Dorenzo the demand was for her to empty the bank's entire vault. That testimony demonstrates that Callion knew that the money was to be stolen from the bank. Even apart from Agent Crocker's testimony, there was sufficient evidence for a jury to conclude that Callion knew the plan was to steal money from the bank. Specifically, Gibbs testified that Callion knew money was coming "from the bank," and knew that it was not coming from a safety deposit box. Viewing that testimony in the light most favorable to the prosecution, a rational jury could also have found beyond a reasonable doubt that Callion understood that the scheme involved robbing the bank. Moreover, even if Callion thought that Dorenzo would withdraw the funds from Zachary's account, a jury could find the requisite intent because, under our case law, where a "robber forces [a] bank's customer to withdraw . . . money, the customer becomes the unwilling agent

of the robber, and the bank is robbed." *United States v. McCarter*, 406 F.3d 460, 463 (7th Cir. 2005) *overruled on other grounds by United States v. Parker*, 508 F.3d 434, 440-41 (7th Cir. 2007).

While the evidence of Durham's intent is less over-whelming, it nevertheless is sufficient to support his conviction for attempted bank extortion when viewed in the light most favorable to the government. Durham was present when Gibbs told Callion that Dorenzo would get the money from the bank, and, in his post-arrest statement, Durham stated that he knew Dorenzo worked at a bank and that he overheard some of the ransom calls to her. A reasonable fact finder could have concluded from that evidence that Durham understood that the scheme involved obtaining the ransom money from the bank vault.

We also are not persuaded by the argument that the evidence demonstrates that Callion and Durham did not become involved in the bank extortion (if at all) until after the offense was completed. Gibbs testified that Callion approved the plan for Dorenzo to get the money from the bank before Zachary ever reached Dorenzo on the phone to relay the demand. Durham was present for that conversation. Therefore, we must affirm Callion and Durham's convictions on Count Two.

### 2. Count One

Callion and Durham also raise sufficiency of the evidence challenges to their convictions on Count One, conspiracy

to rob a federally-insured bank, in violation of 18 U.S.C. § 371. One element of a charge of conspiracy to defraud the United States, in violation of § 371, is intent to commit the substantive offense. *United States v. Cueto*, 151 F.3d 620, 635 (7th Cir. 1998). Callion and Durham maintain that the government presented insufficient evidence of their intent to commit bank robbery. For the reasons stated above with respect to Count Two, we conclude that the government presented sufficient evidence from which a reasonable jury could conclude that Callion and Durham possessed the requisite intent to commit the substantive offense of bank extortion.

## C. Response to Jury Question During Callion's Trial

During its deliberations, the jury at Callion's trial submitted the following question to the judge:

> If the defendant is found guilty on Count 1 [conspiracy to extort], does the clause for Count 2 [attempt to extort] stating, "a defendant's presence at the scene of crime and knowledge that a crime being committed is not alone sufficient to establish the defendant's guilt; a defendant's mere association with conspirators is not by itself sufficient to prove his participation or membership in a conspiracy" still apply?

The judge responded by instructing the jury to re-read the instructions. Callion's counsel objected, requesting that the judge answer the jury's question in the affirmative. In view of the timely objection, we review the district court's

response for abuse of discretion. *United States v. Carani*, 492 F.3d 867, 874 (7th Cir. 2007) (citation omitted).

A district court's discretion in deciding how to respond to a jury question is quite broad, but the court has an obligation to exercise that discretion in a way that "dispel[s] any confusion quickly and with concrete accuracy." *Id.* (citation omitted). Here, the jury expressed confusion regarding whether a portion of the instructions applied under certain circumstances. We believe that re-reading the instructions as the district court directed would have dispelled that confusion. The instructions directed the jury to "give separate consideration to each count," and advised that "your verdict of guilty or not guilty of an offense charged in one count should not control your decision under any other count, except as instructed otherwise in these instructions."

As we have held in the past, a judge does not err by instructing the jury to re-read the instructions in response to a question, so long as the original jury charge clearly and correctly states the applicable law. *United States v. Mealy*, 851 F.2d 890, 902 (7th Cir. 1988). There is no dispute here that the jury instructions were accurate.

Moreover, the affirmative answer Callion's counsel requested might have confused the jury. The instructions also included an instruction allowing the jury to find Callion guilty on Count Two under a *Pinkerton v. United States*, 328 U.S. 640 (1946), theory. The *Pinkerton* instruction provided:

> A conspirator is responsible for offenses committed by his or her fellow conspirators if he or she was a member of the conspiracy when the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy.

> Therefore, if you find the defendant guilty of the conspiracy charged in Count One and if you find beyond a reasonable doubt that while he was a member of the conspiracy, one or more of his fellow conspirators committed the offenses charged in Count Two . . . , in furtherance of and as a foreseeable consequence of that conspiracy, then you should find the defendant guilty of [Count Two].

Thus, if the jury found Callion guilty on the conspiracy count (as the question indicated it had), it could have convicted him on Count Two under a *Pinkerton* theory. Because neither Callion's presence when the extortion was committed, nor his knowledge of that a crime, is relevant under a *Pinkerton* analysis, answering the jury question in the affirmative might have been misleading. For these reasons, we conclude that the district court did not abuse its discretion by responding to the jury question as it did.

### D. Application of § 2B3.2(b)(4)(A) Enhancement to Callion and Durham's Sentences

In sentencing both Callion and Durham, the district court imposed U.S.S.G. § 2B3.2(b)(4)(A)'s two-level enhancement for causing bodily injury to "any victim" in the

commission of the offense of extortion by force or threat of injury or serious damage, concluding that Zachary was such a victim. Callion and Durham contend that, for purposes of § 2B3.2(b)(4)(A), the only possible victims of the crime of attempted extortion are the bank and the United States. Reviewing the district court's interpretation of the sentencing guidelines de novo, *United States v. Veazey*, 491 F.3d 700, 706 (7th Cir. 2007), we decline to adopt that narrow reading of the phrase "any victim."

As Callion and Durham note, at times, § 2B3.2(b) uses the phrase "the victim" to refer to the target of an extortionate demand. § 2B3.2(b)(2) (discussing "the loss to the victim"); application note 5 (defining "loss to the victim" as "any demand paid plus any additional consequential loss from the offense"). However, the application notes indicate that the provision uses the phrase "any victim" to identify a broader category of individuals. In particular, application note 7 states that "[i]f the offense involved the threat of death or serious bodily injury to numerous victims (*e.g.*, in the case of a plan to derail a passenger train or poison consumer products), an upward departure may be warranted." As the First Circuit has observed, in that example, "the train passengers are 'victims' of the train derailment extortion scheme even though the extortionate demand is not made of the passengers themselves*." United States v. Hughes*, 211 F.3d 676, 691 (1st Cir. 2000). Application note 7 cannot be reconciled with defendants' narrow reading of § 2B3.2(b). In addition, the use of the modifier "any" in § 2B3.2(b)(4)(A) supports our broader reading of that provision. *See id.* ("the use of the indefinite article [any] suggests a class of potential victims broader

than the target or targets of the extortionate demand"); *United States v. Sickinger,* 179 F.3d 1091, 1094 (8th Cir. 1999) (finding there to be "a meaningful distinction between the 'any victim' language . . . and the 'the victim' language," as those phrases are used in the Guidelines); *United States v. Malpeso,* 115 F.3d 155, 169 (2d Cir. 1997) (explaining that the Guidelines generally use "the victim" to refer to a single intended victim, and "any victim" to refer to the broader group of those affected by the crime).

Finally, our reading of the phrase "any victim" in § 2B3.2(b)(4)(A) also is consistent with our decision in *United States v. Maiden*, 606 F.3d 337, 339-40 (7th Cir. 2010), in which we affirmed the application of the bodily injury enhancement where a bank teller was injured by the use of pepper spray. There, the bank, not the teller, was the target of the extortionate demand. For these reasons, we conclude that the district court properly determined that Zachary was a victim within the meaning of § 2B3.2(b)(4)(A).

### E.  Collins's Sentence

The Sentencing Guidelines designate any defendant convicted of a "crime of violence or a controlled substance offense" who also has at least two prior felony convictions of either a crime of violence or a controlled substance offense as a "career offender." *See* § 4B1.1; *United States v. Woods*, 576 F.3d 400, 403 (7th Cir. 2009). In sentencing Collins, the district court found him eligible to be sentenced under Guideline § 4B1.1 as a career offender based on previous convictions for possession of a controlled

substance with intent to deliver and aggravated battery. The court then sentenced Collins to a low-end guidelines sentence of 151 months on Count Two and to the 120 month mandatory minimum on Count Three, and ordered that the sentences be served consecutively as is mandated by 18 U.S.C. § 924(c).

Collins raises several challenges to his sentence. First, he maintains that the district court erred in applying the 120-month enhancement under 18 U.S.C. § 924(c)(1)(A)(iii) for discharging a firearm "during and in relation to any crime of violence," because Gibbs's shotgun discharge was accidental. As the district court properly concluded, an accidental firearm discharge can trigger the 10-year mandatory minimum because § 924(c) does not include an intent to discharge the firearm requirement. *Dean v. United States*, 129 S.Ct. 1849, 1855-56 (2009) ("[t]he 10-year mandatory minimum applies if a gun is discharged in the course of a violent or drug trafficking crime, whether on purpose or by accident."). Contrary to Collins's reading of *Dean*, we do not believe the Supreme Court intended to limit *Dean* to cases in which the accidental gunshot might hurt or scare victims. While the Court noted that such accidents "increase[] the risk that others will be injured, that people will panic, or that violence (with its own danger to those nearby) will be used in response," it did not condition its holding on the existence of an increased risk or intimidation. *Id.*

Second, Collins contends that the district court erroneously treated the career criminal guidelines as mandatory. An examination of the sentencing hearing transcript belies

that claim. After recognizing that judges can refuse to follow the guidelines if they disagree with the policy, the sentencing judge expressly stated that he did *not* disagree with the policy behind the career offender guidelines in Collins's case. The judge explained that while he does disagree with the policy "where the triggering offenses are minor drug offenses," he had no disagreement with the policy "as it's applied in this case," noting Collins's long criminal history and the fact that he was charged with possessing a gun after a felony conviction. Collins maintains that the judge must have thought the guidelines were mandatory because one of Collins's two triggering offenses was a minor drug conviction. We disagree. Collins's other triggering offense was an aggravated battery conviction for which he was sentenced to ten years imprisonment and served four. Moreover, Collins had a long criminal history, which placed him in criminal history category VI, the highest of the criminal history categories. The transcript indicates that the combination of the violent battery conviction and Collins's criminal background convinced the district judge that deviation from the career criminal guidelines was not warranted in Collins's case, not that the judge overlooked the guidelines' advisory nature.

Third, Collins argues that the district court erroneously considered arrest reports cited in the presentence investigation report in determining his sentence. Under *Shepard v. United States*, 544 U.S. 13 (2005), a sentencing court may not consider police reports to determine whether a prior conviction meets the definition of a crime of violence or a controlled substance offense for purposes of classifying a defendant as a career offender. Here, the district court

considered the contents of an arrest report, not to classify Collins's prior convictions, but to conclude that a deviation from the career criminal guidelines was unwarranted. Specifically, the court referenced a 1996 arrest report for unlawful use of a firearm by a felon, which indicated that Collins was arrested on a signed complaint that he struck two female victims in the face and threatened to kill them while menacing them with the pistol. Collins was convicted of that offense.

Because the court did not rely on the arrest reports to identify Collins's qualifying offenses, it did not run afoul of *Shepard*. We have noted that district courts may "consider the underlying conduct detailed in arrest records where there is a sufficient factual basis for the court to conclude that the conduct actually occurred." *United States v. Guajardo-Martinez*, 635 F.3d 1056, 1059 (7th Cir. 2011). The defendant bears the burden of showing that the presentence report is inaccurate or unreliable, and "a defendant's bare denial of information in a presentence report is insufficient to challenge its accuracy and reliability." *United States v. Turner*, 604 F.3d 381, 385 (7th Cir. 2010) (citation and quotations omitted). Here, all we have is Collins's claim at the sentencing hearing that the victims were lying; that bare denial is insufficient to undermine the information relied on by the district court in refusing to deviate below the guidelines range.

Finally, Collins claims that his sentence was unreasonably high as compared to Callion and Durham. Because Collins received a guidelines sentence, that sentence is entitled to a presumption of reasonableness, which Collins

can rebut only by demonstrating that his sentence is unreasonable when measured against the § 3553(a) factors. *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005). One of the factors set forth in § 3553(a) is "the need to avoid unwarranted sentence disparities among defendants with *similar records* who have been found guilty of *similar conduct*." 18 U.S.C. § 3553(a)(6) (emphasis added).

As we have explained in the past, the purpose of § 3553(a)(6) is to eliminate unjustified sentencing disparities "across judges (or districts) rather than among defendants to a single case." *United States v. Davila-Rodriguez*, 468 F.3d 1012, 1014 (7th Cir. 2006); *see also United States v. Omole*, 523 F.3d 691, 700 (7th Cir. 2008) (a discrepancy between sentences of co-defendants is not a basis for challenging a sentence). Therefore, Collins's argument is misplaced.

Moreover, even if we were to compare Collins's sentence to those of Callion and Durham, we would not conclude that Collins's sentence is unreasonably high. Section 3553(a)(6) applies to defendants with *similar records* who have been found guilty of *similar conduct*. Collins is not similar to Callion and Durham in either of those regards. He had a more extensive criminal record, which put him in criminal history category VI, while Callion was in criminal history category II and Durham was in criminal history category III. In addition, Collins pled guilty to different offenses than those for which Callion and Durham were convicted. Collins pled guilty to Counts Two and Three, whereas Callion and Durham were convicted of Counts One and Two, and acquitted on Count Three. The offense

charged in Count Three carries a mandatory minimum sentence that must be served consecutively to any other sentence. *See* 18 U.S.C. § 924(c). That distinction alone explains much of the disparities in the sentences. For the foregoing reasons, we affirm Collins's sentence.

### F.   Swopes's Sentence

Like Collins, Swopes was sentenced as a career offender pursuant to § 4B1.1. The district court calculated the guideline range on Count Two to be 151 to 188 months, and sentenced Swopes to 170 months on that count. The court sentenced Swopes to the statutory minimum of 120 months on Count Three, and ordered the sentences to be served consecutively, as 18 U.S.C. § 924(c) requires. Swopes raises several challenges to his sentence.

Swopes first contends that the district court failed to address one of his primary arguments in favor of a lower sentence, which we have held to be error. *See United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005). At the sentencing phase, Swopes asked the court to consider his mental impairment as a mitigating factor. Swopes relied on two psychological evaluations to support his claim of mental impairment.

In the spring of 2009, Bureau of Prisons Psychologist Dr. Ron Nieberding evaluated Swopes in order to determine his competency to stand trial. Dr. Nieberding diagnosed Swopes with a number of mental disorders including borderline intellectual functioning, cannabis abuse in remission, depression disorder not otherwise specified,

and anti-social personality disorder. Dr. Nieberding reported that Swopes's IQ is between 70 and 79, which is well below average. At age 17, Swopes was assaulted with a baseball bat and pistol butt. Dr. Nieberding opined that the head injury Swopes suffered in that attack might have "residual effects" on Swopes, but that "his current functioning is likely to be influenced to a greater extent by his life style choices (*i.e.*, chronic substance abuse, criminal behavior), and emotional factors (*i.e.*, underdeveloped coping skills, poor frustration tolerance)." Dr. Nieberding nevertheless found Swopes to be competent to stand trial.

In preparation for sentencing, Dr. Robert Hanlon performed a neuropsychological examination of Swopes. Dr. Hanlon reported that Swopes has an IQ of 74, and opined that Swopes "manifests multiple cognitive and intellectual deficits that represent a disabling mental impairment." Based on the inverse correlation between education and crime, Dr. Hanlon opined that psychological counseling and further education "may be expected to potentially decrease the likelihood of future criminal behavior for inmates like Mr. Swopes."

Based primarily on Dr. Hanlon's report, counsel for Swopes argued that Swopes's mental impairment should be considered a mitigating factor because it made him a good candidate for rehabilitation. The sentencing judge addressed that argument and rejected it, reasoning that Dr. Hanlon's opinion was of little value because Dr. Hanlon had made no specific prediction regarding the degree to which Swopes would benefit from education

and treatment based on his individual potential and prior history.

Swopes now argues that the district court should have considered his mental impairment to be a mitigating factor because it reduced his culpability. Swopes made no such argument below. Consequently, it fails for two reasons. First, the argument is waived. *Tully v. Barada*, 599 F.3d 591, 594 (7th Cir. 2010). Second, below, Swopes sought to have the court consider his mental impairments under § 3553(a)(1), which identifies "the history and characteristics of the defendant" as an appropriate sentencing consideration. He did not argue that he suffered from a diminished capacity—meaning an inability to understand the wrongfulness of his actions or to control his actions—that substantially contributed to the commission of the offense. *See* Application Note to U.S.S.G. § 5K2.13. As we explained in *United States v. Portman*, 599 F.3d 633 (7th Cir. 2010), the distinction between diminished capacity and personal characteristics that either increase or decrease the risk of recidivism (*i.e.,* aggravating or mitigating factors) is an important one. A finding of diminished capacity should never be treated as an aggravating factor for sentencing purposes. *Id.* at 138. By contrast, a defendant must show why a particular personal characteristic, such as a low IQ, acts as a mitigating factor, as opposed to an aggravating one. *See id.* at 138 (noting that age could be a mitigating or aggravating factor); *United States v. Beier,* 490 F.3d 572, 574 (7th Cir. 2007) (defendant must show why particular characteristics, including low IQ, "require a shorter sentence or a longer sentence than would be appropriate for a defendant who lacked those

characteristics"). Here, Swopes never argued that his mental impairments should be treated as mitigating because they reduced his culpability, and therefore the district court did not err in not treating them as such. The district court gave due consideration to the only argument Swopes advanced for why his mental impairments should be considered a mitigating factor, and reasonably rejected it.

Swopes belatedly advances a diminished capacity argument here, but he waived that argument as well. *Tully*, 599 F.3d at 594. In any event, the district court could not have found that any diminished capacity Swopes allegedly suffered substantially contributed to his commission of the crimes based on the evidence before it. A diminished capacity finding will be made where the defendant (1) could not understand the wrongfulness of his behavior or could not control that behavior at the time of the offense, and (2) that significantly reduced mental capacity contributed substantially to the commission of the offense. *See* U.S.S.G. § 5K2.13; *Portman*, 599 F.3d at 637. Neither of the reports on which Swopes relies indicates that he could not understand the wrongfulness of his conduct or control his behavior at the time of the offense. Nor does Swopes even attempt to demonstrate the requisite connection between his mental capacity and the actions underlying his crimes. That connection cannot be assumed. *Id.* at 639.

With respect to his mental impairment, Swopes also argues that the district court erred by treating that characteristic as an aggravating factor. We find nothing in the sentencing transcript to support that contention. For that

reason, and those above, we conclude that the district court did not err in its consideration of Swopes's mental impairment for sentencing purposes. Before moving on, however, we note that the government did argue that Swopes's mental capacity should be treated as an aggravating factor. During the sentencing hearing, the prosecutor stated that "if anything [Swopes's mental capacity] shows a greater danger, because it appears that not every person who has a borderline intelligence is out there committing violent crimes, but Mr. Swopes is. And that makes him a greater danger to society. And I think that that has to be considered in making his sentence." The government's contention in its brief that "it never argued that defendant's cognitive impairments alone made him a danger to society" appears specious.

Like Collins, Swopes argues that his sentence was unreasonably high in comparison to those of his co-defendants. Because Swopes has not demonstrated an unjustifiable disparity between the length of his sentence and "all other similar sentences imposed *nationwide*," we will not disturb his sentence. *Omole*, 523 F.3d at 700 (citation omitted, emphasis in original).

Finally we reach the objection we consider meritorious. Swopes maintains that the district court committed a significant procedural error in sentencing by relying on a clearly erroneous fact—that Swopes had prior involvement with guns. During sentencing, the district judge stated: "Obviously his prior encounters with the criminal justice system, and there were a lot, didn't deter him from quickly signing on to do this lick. And his prior involvement with

violent offenses, drugs and guns, means that he does represent a risk to the community." In fact, Swopes had no prior convictions involving the use of firearms. Because Swopes failed to object to that error at the sentencing hearing, we review for plain error.

The government contends that the district court's reference to guns was not an error, but a reference to Swopes's use of a firearm in this case. Despite our efforts, we cannot conclude that the proposed interpretation is a fair reading of the transcript. That makes two troubling representations of the record by the government in relation to Swopes's sentencing hearing. Needless to say, intentional or not, such questionable observations are regrettable from any litigant, and are particularly unsettling when they come from the government. All of that is to say we agree with Swopes that the district court appears to have misapprehended the record with respect to his past use of firearms.

Having determined that a plain error occurred, we turn to whether that error affected Swopes's substantial rights by resulting in a different sentence than he otherwise would have received. *United States v. Corona-Gonzalez*, 628 F.3d 336, 341 (7th Cir. 2010). In selecting Swopes's sentence, the district court focused on the violent nature of the crime, the fact that Swopes readily agreed to participate despite having been paroled just nine months earlier, and Swopes's significant criminal history, which the judge apparently believed included the use of firearms. While the court mentioned guns only once, based on our reading of the transcript, we conclude that it is "not improbable that

the trial judge was influenced by improper factors in imposing sentence." *Rizzo v. United States,* 821 F.2d 1271, 1274 (7th Cir. 1987) (internal quotation marks omitted). Finally, we conclude that a sentence potentially based on an erroneous fact affects the fairness, integrity, and public reputation of the proceeding. *Corona-Gonzalez,* 628 F.3d at 342.

We consequently vacate Swopes's sentence and remand the case to the district court for resentencing. On remand, the district court simply must reassess the sentence without the factual error referenced above. No other aspects of the original sentencing procedure are to be reconsidered.

### III. Conclusion

For the reasons set forth above, we AFFIRM Callion and Durham's convictions and sentences, as well as Collins's sentence. Swopes's sentence is VACATED, and the case is REMANDED solely to give the district court the opportunity to reconsider Swopes's sentence free from any misapprehension regarding his prior use of firearms.