In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1512

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TREVOR LUCAS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 09-cr-150—**William M. Conley**, *Chief Judge.*

ARGUED OCTOBER 20, 2011—DECIDED FEBRUARY 29, 2012

Before CUDAHY, KANNE, and SYKES, *Circuit Judges.*

KANNE, *Circuit Judge.* Following a dispute over stolen "gold" in an online video game, Trevor Lucas devised an incredibly detailed and disturbing plan over the course of a year and a half to get revenge on the would-be "thief," CG, a minor living with his mother in Wisconsin. Lucas discovered CG's home address, drove twenty hours to CG's home, and impersonated a law enforcement officer in an attempt to lure

CG out of the house and kidnap him. When CG's mother refused to allow Lucas into the house, he attempted to gain entry by pointing a handgun directly at her face. But CG's mother quickly slammed the front door before he could react, and Lucas fled while she called police. He was eventually arrested in his home state of Massachusetts. Lucas pled guilty to brandishing a firearm during a crime of violence and the district court sentenced him to 210 months' imprisonment. He now appeals his sentence, presenting a barrage of arguments claiming the district court committed error at sentencing and the sentence was substantively unreasonable. We find none of these contentions meritorious, and accordingly affirm Lucas's sentence.

## I. BACKGROUND

Lucas became acquainted with CG while playing an online video game, World of Warcraft. While playing the game, Lucas began sending sexual messages to the minor asking CG to send naked pictures of himself. CG refused, and placed Lucas on a World of Warcraft "ignore list." But Lucas became fixated on CG, and found other means to contact him. He offered CG $5,000 in online "currency" if CG would remove him from the ignore list. CG agreed, but soon after Lucas again began sending him sexual messages. CG again placed Lucas on the ignore list, but this only served to infuriate Lucas. Lucas began sending threatening messages, telling others that he intended to kill CG, and demanding the return of his "gold." Although CG reported Lucas's

online threats to the Madison Police Department, no charges were brought against Lucas.

Lucas concocted a detailed plan to kidnap CG. He began by building a massive arsenal of weapons rivaling that of a local police department, including rifles, handguns, stun guns, canisters of pepper spray, handcuffs, restraints, and other various law enforcement and military equipment. He then learned CG's home address by contacting another minor in Madison, whom he had also met while playing video games online. The minor was willing to divulge the address in exchange for $500 (in actual, rather than virtual, currency). Finally, Lucas took steps to prepare his vehicle for the kidnapping. Lucas had his car outfitted to resemble a police vehicle, with large antennas in the rear and a pullbar in the front of the vehicle. Lucas then attempted to have an automotive shop remove the emergency release latch from the trunk of his car, presumably so that he could transport CG without fear of his escape. When he examined the car, the shop employee noticed that the inside of the trunk had been lined with a clear plastic cover.[1] The employee then refused to remove the release latch from the trunk because doing so was ille-

---

[1] At sentencing, both sides vehemently disputed the significance of the plastic lining. The government argued that the plastic lining was evidence that Lucas intended to transport a body, while the defense argued that Lucas placed the lining in his car because he helped his mother carry groceries to centers for the homeless. The district court expressly did not factor the presence of the plastic lining into its decision.

gal. Nevertheless, Lucas managed to do so himself, and he moved on to executing his plan to kidnap CG.

On August 25, 2009, Lucas began driving twenty hours from his home in Massachusetts to CG's home in Wisconsin. When he arrived, CG's mother, rather than CG, answered the door. Lucas identified himself as an agent of the "National Security Recruiting Department," and demanded to speak with CG. CG's mother, taking notice of Lucas's generally unkempt appearance and untied shoelaces, grew doubtful that he belonged to this vaguely named "law enforcement agency." She refused to admit Lucas into the home, at which point Lucas retrieved a handgun from his car and pointed it directly at her face. In a panic, CG's mother slammed the front door before Lucas could react. Lucas then fled in his vehicle back to his home in Massachusetts.

Lucas was arrested two days later in Massachusetts. Officers recovered two loaded handguns, ammunition, two stun guns, three canisters of pepper spray, seven pairs of handcuffs, twenty-eight flex restraints, three rolls of duct tape, one box of latex gloves, three military style knives, and other miscellaneous items from the trunk of his car. In a wooded area outside of Lucas's home, officers discovered a cave where Lucas had stockpiled even more weapons. Inside the cave, officers also found two holes Lucas had dug measuring five-feet by ten-feet by two-feet.[2] At the time of his arrest, Lucas was on

---

[2] Both sides also disputed the significance of the holes. The government argued that the holes were meant to be used as
(continued...)

conditional release in Massachusetts due to a previous arrest for illegal possession of large-capacity firearms in April of 2009.

Lucas was charged with unlawfully transporting a firearm with the intent to commit a felony, 18 U.S.C. § 924(b); attempted kidnapping, 18 U.S.C. § 1201(a)(1), (d); and intentionally brandishing a gun during and in relation to a crime of violence, 18 U.S.C. § 924(c). On December 15, 2010, pursuant to a written plea agreement, Lucas pled guilty to § 924(c)(1)(A)(ii), and the other charges were dismissed. The plea agreement provided that Lucas faced a mandatory minimum seven-year term of imprisonment, with a maximum term of life imprisonment. It also stated that the court was free to impose any sentence up to and including the statutory maximum.

The presentence investigation report ("PSR") was docketed on January 19, 2011. A sentence for a § 924(c) conviction ordinarily runs consecutively with the sentence for a conviction of an underlying offense. But because the underlying offense of kidnapping was dismissed pursuant to the plea agreement, the PSR indicated that the applicable guidelines range for the § 924(c) violation was the statutory minimum of seven

---

[2] (...continued)

a grave, while the defense maintained the purpose of the holes was to conceal the weapons hidden in the cave. Again, the district court expressly did not factor the presence of the holes into its decision.

years under U.S.S.G. § 2K2.4(b). Nonetheless, the PSR noted that had Lucas pled guilty to the dismissed count of attempted kidnapping, he would have had an additional guidelines range of seven to nine years. The PSR also stated that an upward variance from the guidelines sentence could be supported by U.S.S.G. § 4A1.3, inadequacy of criminal history, and/or by U.S.S.G. § 5K2.0(a)(2), (3), circumstances of a kind and to a degree not adequately taken into consideration. Lucas filed factual objections to the PSR and filed a sentencing memorandum containing a report by Dr. Jeffrey Marcus. In the report, Dr. Marcus stated that Lucas did not possess the capacity to understand the significance of his behavior at the time of his offense because he suffers from various psychological conditions, including Asperger's Syndrome, Attention Deficit Hyperactive Disorder, and Bipolar Disorder. He also concluded that Lucas's criminal conduct was caused by a manic episode triggered by a new prescription medicine, Provigil.

Lucas was sentenced on February 23, 2011. The district court began by calculating the applicable guidelines sentence for the § 924(c) conviction as the mandatory minimum of seven years.[3] The court stated that although Lucas's relevant conduct in the dismissed attempted kidnapping count was not factored into this calculation,

---

[3] According to § 2K2.4(b), the guidelines sentence for violating § 924(c) is "the minimum term of imprisonment required by statute." U.S.S.G. § 2K2.4(b). A conviction for § 924(c)(1)(A)(ii) requires a sentence of "not less than 7 years." 18 U.S.C. § 924(c)(1)(A)(ii).

it nevertheless would take this conduct into consideration when deciding an appropriate sentence. The district court then determined what guidelines range would have applied had Lucas been found guilty of attempted kidnapping under U.S.S.G. § 2X1.1(a). The guidelines range for the underlying offense of kidnapping would ordinarily have been 87 to 108 months, followed by the seven-year consecutive term for the violation of § 924(c), for a total guidelines range of 171 to 192 months. Afterwards, the court reiterated that the starting point under the guidelines was the seven-year minimum sentence.

The district court then went into great detail discussing the troubling facts involved in the case. The court highlighted the year and a half Lucas spent making threats and preparing to kidnap CG, and was particularly disturbed by facts indicating that he may have intended to kill CG. The court also discussed Lucas's history of mental health problems, including Dr. Marcus's report and Lucas's parents' significant but ultimately futile efforts to assist their son. The district court ultimately rejected Dr. Marcus's finding that the criminal conduct was caused by a manic episode because Lucas began making threats and preparing to kidnap CG well before he was prescribed Provigil.

The district court then announced its decision to vary upward from the guidelines sentence of seven years. The court found that an upward variance pursuant to U.S.S.G. § 4A1.3 was warranted because Lucas committed this offense while on conditional release following his

arrest for possession of large-capacity firearms. The court also found that under U.S.S.G. § 5K2.0, there were existing aggravating factors of a kind and to a degree not adequately taken into consideration because relevant conduct—the dismissed attempted kidnapping charge—was not otherwise considered in the guidelines sentence of seven years. Finally, the court imposed a 210-month sentence, followed by a five-year term of supervised release. The court found that the sentence would serve to hold Lucas accountable, serve as a deterrent, protect the community, provide the opportunity for rehabilitative programs, and achieve parity with sentences of similarly situated offenders.

Lucas appeals his sentence, arguing that the district court committed a host of errors at sentencing and that the 210-month sentence was substantively unreasonable. We take each of these arguments in turn.

## II. ANALYSIS

On appeal, we review a district court's sentence for reasonableness, *United States v. Booker*, 543 U.S. 220, 260-62 (2005), under an abuse of discretion standard, *Gall v. United States*, 552 U.S. 38, 46 (2007). "We presume that a sentence within a properly calculated guidelines range is reasonable, but there is no corresponding presumption of unreasonableness for a non-guidelines sentence." *United States v. Reyes-Hernandez*, 624 F.3d 405, 409 (7th Cir. 2010) (internal quotation marks omitted). Moreover, "we review *de novo* a district court's interpretation of

the guidelines." *Id.* (*citing United States v. Diekemper*, 604 F.3d 345, 355 (7th Cir. 2010)).

Our review of sentencing decisions proceeds through a two-step inquiry. *United States v. Moreno-Padilla*, 602 F.3d 802, 810 (7th Cir. 2010). First, "we ensure that the district court did not commit any significant procedural error, examples of which include failing to calculate, or improperly calculating, the applicable Guidelines range; treating the Guidelines as mandatory; or failing to consider the 18 U.S.C. § 3553(a) factors." *Id.* (internal quotation marks omitted). Second, "if we determine there was no procedural error, we then examine 'the substantive reasonableness of the sentence' itself." *Reyes-Hernandez*, 624 F.3d at 409 (*quoting Gall*, 552 U.S. at 51).

*A. Procedural Error*

A sentencing proceeding should begin with a calculation of the applicable guidelines, *Gall*, 552 U.S. at 49, and Lucas concedes that the district court correctly calculated the applicable guidelines sentence of 84 months under U.S.S.G. § 2K2.4. Nevertheless, Lucas argues that the district court committed a number of procedural errors before ultimately imposing a sentence of 210 months' imprisonment.

Lucas presents three challenges to the district court's application of the Sentencing Guidelines. First, Lucas argues that the district court impermissibly calculated what the applicable guidelines would have been for the dismissed count of attempted kidnapping. Although

the district court was free to consider this conduct, Lucas asserts that the court went too far because he was essentially sentenced as though he pled guilty to attempted kidnapping, despite the charge having been dismissed pursuant to the plea agreement. This, he claims, disregards the terms of U.S.S.G. § 2K2.4 by imposing a cross-reference provision not contained within the sentencing guidelines.

Thus, Lucas argues that although the district court is free to punish a defendant more severely on the basis of relevant conduct, it is unable to calculate what the applicable guidelines sentence would have been for a dismissed offense. We disagree.

A district court may consider a wide range of conduct at sentencing, including acquitted conduct and dismissed offenses. *See United States v. Black*, 625 F.3d 386, 394 (7th Cir. 2010) ("'A jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.'") (*quoting United States v. Watts*, 519 U.S. 148, 157 (1997) (per curiam)). Indeed, 18 U.S.C. § 3661 provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

District courts enjoy discretion in determining what information to consider at sentencing, and Lucas cites no authority for the distinction that he urges us to

adopt, nor do we see the logic in such a distinction. The district court was free to punish Lucas more severely on the basis of relevant conduct, and found that he had committed the underlying offense of attempted kidnapping by a preponderance of the evidence. By calculating what guidelines sentence would have applied, the district court merely attempted to provide a guidelines-related framework to take account of the dismissed offense. Perhaps this caused some confusion, but the court committed no procedural error. Indeed, the district court reiterated that the applicable guidelines sentence was seven years, and that would be the starting point in its determination of an appropriate sentence.

Next, Lucas asserts that even if it was permissible for the district court to calculate the applicable guidelines sentence for attempted kidnapping, the court nevertheless incorrectly calculated the offense level. Lucas claims that the district court erred in finding that a three-level reduction under U.S.S.G. § 2X1.1(b) was unavailable. Under § 2X1.1(b)(1), a three-level reduction is provided for crimes that were attempted but not completed. However, this reduction only applies if the defendant had not "completed all the acts the defendant believed necessary for successful completion of the substantive offense or the circumstances demonstrate that the defendant was about to complete all such acts but for apprehension or interruption by some similar event beyond the defendant's control." U.S.S.G. § 2X1.1(b)(1).

The district court found that the three-level reduction would not have applied for attempted kidnapping be-

cause Lucas carried out all the acts he believed necessary to complete the underlying offense of kidnapping. This, Lucas argues, was procedural error because he never even saw CG—CG's mother closed the door on Lucas after he pointed a gun at her—and therefore he never completed all of the acts he believed necessary to kidnap CG. He would need to have brought CG to his car and forced him into the trunk to have completed all of the acts necessary; this Lucas did not do, and thus he was entitled to a three-level reduction.

Lucas's logic mistakenly relies on his victim's responses, rather than on the defendant's own acts, which are the only thing the guidelines mention. In *United States v. Emmett*, 321 F.3d 669 (7th Cir. 2003), we found that the three-level reduction in § 2X1.1 did not apply to a defendant who attempted a bank robbery on two separate occasions by walking into a bank and handing the teller a note demanding money. Both times, the tellers refused to comply with his demands. Although he did not receive any money, we held that the fact that the defendant failed "does not mean that he did not think he was doing everything he needed to do in order to succeed." *Id.* at 673-74. Likewise, Lucas thought that he did everything necessary to complete the kidnapping: he drove to CG's home, pointed a gun at CG's mother's face, and demanded that CG come to the door. He would have succeeded, but for the quick thinking of CG's mother. This is enough to disqualify him for the downward adjustment provided by § 2X1.1.

Lucas further argues that the district court committed procedural error by applying a prohibited upward depar-

ture based on § 4A1.3, inadequacy of criminal history. According to § 2K2.4, when a district court calculates the sentence for a conviction of § 924(c), Chapter 4 "shall not apply to that count of conviction." U.S.S.G. § 2K2.4(a). After discussing the fact that Lucas was on conditional release in Massachusetts for illegal possession of firearms, the district court stated that "this egregious conduct . . . warrants an upward variance pursuant to section 4A1.3." (Sent. Tr. at 29.) Because such a departure was prohibited, Lucas argues he is entitled to resentencing.

The concept of departures was rendered obsolete when the guidelines were made advisory in *Booker*, 543 U.S. at 226-27. *See United States v. Miranda*, 505 F.3d 785, 792 (7th Cir. 2007). But district courts can still take guidance from the departure provisions in the guidelines and apply them by way of analogy when assessing the § 3553(a) factors. *See United States v. Guyton*, 636 F.3d 316, 320 n.2 (7th Cir. 2011); *United States v. Schroeder*, 536 F.3d 746, 756 (7th Cir. 2008). The district court's duty is to properly calculate the guidelines range and then come up with a reasonable sentence under § 3553(a). *United States v. Munoz*, 610 F.3d 989, 994 (7th Cir. 2010).

The district court did not commit procedural error because it correctly calculated the applicable guidelines sentence of seven years for the conviction of § 924(c). The court then appropriately considered and explained the relevant § 3553(a) factors when determining whether to apply a sentence outside the guidelines range, and applied § 4A1.3 by way of analogy. Lucas was out on

bond for illegal possession of weapons in Massachusetts when he committed the present offense, and the district court could have considered this same fact without reference to § 4A1.3. *See United States v. Jackson*, 547 F.3d 786, 793 (7th Cir. 2008) ("[A]fter *Booker*, a sentencing court is no longer required to follow § 4A1.3 when imposing an above-guidelines sentence."). The district court was attempting to ground its analysis in the guidelines and committed no error in doing so.

## B. Reliable Evidence

Lucas next argues that the district court erred by sentencing him based on facts it failed to find by a preponderance of the evidence. Sentencing courts have discretion to draw conclusions about the testimony given and evidence introduced at sentencing. *United States v. England,* 555 F.3d 616, 622 (7th Cir. 2009). Due process requires that sentencing determinations be based on reliable evidence, rather than speculation or unfounded allegations. *United States v. Santiago*, 495 F.3d 820, 824 (7th Cir. 2007). "Evidence will satisfy this requirement if it bears sufficient indicia of reliability to support its probable accuracy." *Id.* (internal quotation marks and punctuation omitted). Generally, facts considered at sentencing must be proved by a preponderance of the evidence. *England*, 555 F.3d at 622.

Lucas argues that the district court based its lengthy sentence on the sheer speculation that had CG answered the door—rather than his mother—Lucas would have kidnapped and harmed him. Lucas maintains that he

only intended to scare CG, not kidnap or harm him, and thus there was insufficient evidence for the district court to punish him on this basis. Moreover, Lucas argues that, in any event, the district court failed to find that Lucas would have kidnapped CG by a preponderance of the evidence. In support of this contention, Lucas points to a number of statements the district court made when discussing the egregious facts of the case. For example, the district court stated, "I don't know what would have happened had someone else answered the door." (Sent. Tr. at 27.) Because the district court did not know what would have happened, Lucas posits, it failed to find that he intended to kidnap CG by a preponderance of the evidence.

Lucas's argument is unavailing. It was not speculation that Lucas wanted to kidnap CG; there were an abundance of facts supporting this finding. Lucas told others that he planned to kill CG, he paid someone $500 to learn CG's home address, he removed the emergency-release latch from the trunk of his car so that CG would have no means of escape, he drove to CG's home armed with an entire arsenal, and he pointed a gun at CG's mother's face after demanding to see CG. Certainly, these facts allowed the district court to infer that Lucas intended to do more than simply scare CG.

Lucas conflates the worry of the district court that Lucas planned to kill CG with the court's finding that Lucas attempted to kidnap CG. Some of the facts, especially those contested by Lucas at sentencing, suggested that Lucas may have planned to kill CG and bury his

body in the holes Lucas prepared outside his home in Massachusetts. This thought deeply disturbed the district court, which is why it reiterated that it did not know what would have happened had CG answered the door. But the court made clear that it was *not* basing its sentence on this speculative possibility, stating that it was "almost beside the point whether [the holes in the cave near Lucas's home] are graves." (Sent. Tr. at 10.) Rather, what influenced the court's decision, and what the district court found by a preponderance of the evidence, was that Lucas attempted to kidnap CG. As we discussed above, the district court went so far as to find that Lucas completed all the steps he believed reasonably necessary to complete the underlying offense of kidnapping. The court did not rely on speculation in sentencing Lucas.

## C.  *Diminished Capacity*

Lucas next claims that the district court erred by treating his diminished capacity as an aggravating factor rather than a mitigating factor. A district court is not required to accept a defendant's argument that a mitigating factor warrants a lower sentence, *United States v. Garthus*, 652 F.3d 715, 718 (7th Cir. 2011), but must address "all of a defendant's principal arguments that are not so weak as to not merit discussion," *United States v. Johnson*, 643 F.3d 545, 549 (7th Cir. 2011) (internal quotation marks omitted). Diminished capacity is a "ground of recognized legal merit for seeking a lesser sentence," *United States v. Portman*, 599 F.3d 633, 637

(7th Cir. 2010) (internal quotation marks omitted), and refers to cognitive or psychological limitations that fall short of insanity, severe mental retardation, or dementia, *Garthus*, 652 F.3d at 717. These limitations contribute to the crime for which a defendant is being sentenced by "reducing—though not eliminating—his ability to appreciate the wrongfulness of his acts, or by reducing his ability to avoid committing them." *Id.*

At sentencing, Lucas argued that he should receive a reduced sentence because he committed the offense while suffering from diminished capacity due to a number of psychological conditions, most notably Asperger's Syndrome. These conditions, Lucas argued, did not allow him to appreciate the significance of his behavior. Moreover, the report submitted by Dr. Marcus reasoned that Lucas's behavior was a result of a manic episode, likely triggered by a prescription for Provigil. The report speculated that Lucas would never have planned or carried out his road trip, save for the manic episode. The district court rejected Lucas's arguments, pointing out that "most people with Asperger's or bipolar disorders do not act out criminally at all, much less harm themselves and travel across the country to kidnap a child." (Sent. Tr. at 30-31.) The district court also disagreed with the conclusions of Dr. Marcus's report, noting that Lucas took extensive steps to plan the kidnapping long before he was prescribed Provigil.

Lucas now contends that the district court treated the psychological conditions underlying his purported diminished capacity as an aggravating factor and increased

his sentence on this basis. For example, the district court stated: "[M]ost bipolar people don't, even in a manic episode, don't go off and endanger others. I mean, to me, it cuts at least the other way as much as it does that I should find it a mitigating circumstance." *Id.* at 16. Lucas construes the court's assertion that "it cuts at least the other way" to mean that the district court necessarily treated the condition as an aggravating factor. Moreover, immediately prior to announcing Lucas's sentence, the district court doubted whether "Lucas appreciates the impact of his actions even now" and stated that "an incapacity to understand the significance of his actions[] fundamentally describes what led to this tragedy." *Id.* at 31. These statements, Lucas argues, demonstrate that the district court treated Asperger's Syndrome and his other psychological conditions as an aggravating factor.

Lucas, however, mischaracterizes the district court's statements. These statements do not demonstrate that the court was treating his psychological conditions as an aggravating factor. Instead, the court used these statements to reject Lucas's argument that he should receive a reduced sentence due to his purported diminished capacity. *See Portman*, 599 F.3d at 638 ("Of course . . . a district court could find diminished capacity but choose not to reduce a sentence. For example, a court could find that the defendant would remain dangerous after treatment."). The district court did not believe a reduced sentence was warranted because Lucas committed the offense despite his parents' extensive efforts to help their son control his behavior. For example,

the district court noted that Lucas was "enrolled in coun-
seling, special education and life skills programs," his
parents provided further support "through behavioral
modification programs at home," and that "it's hard to
think of what else two parents could have done for a
son they loved who had a profound disorder." (Sent. Tr.
at 22.) Thus, given the extent of personal and professional
support Lucas received throughout his troubled life,
even if Lucas's purported diminished capacity con-
tributed to the commission of the crime, a reduced sen-
tence was not appropriate because Lucas would likely
remain dangerous after treatment.

In any event, the court also made clear that it did not
believe that individuals suffering from Asperger's were
more likely to engage in criminal behavior. Thus, there
is no basis to conclude that the district court treated
Lucas's diminished capacity as an aggravating factor,
rather than reasonably rejected Lucas's argument and
refused to reduce his sentence.[4] *See United States v. Lange*,

---

[4] Even if the district court had treated Lucas's diminished
capacity as an aggravating factor, it is not clear that this neces-
sarily would have been impermissible. *See Garthus*, 652 F.3d
at 717-18 ("From a 'just deserts' standpoint, diminished
capacity argues for a lighter sentence, but from the standpoint
of preventing recidivism it argues for a heavier one. . . . [U]nder
the *Booker* regime a sentencing judge can adopt his own
penal philosophy. And so he can disregard the guidelines'
classification of diminished capacity as a mitigating factor,
regard it as an aggravating factor, or regard it as a wash."

(continued...)

445 F.3d 983, 986 (7th Cir. 2006) (upholding sentencing court's rejection of diminished capacity based on defendant's "Asperger's-like" syndrome).

## D. *Rehabilitative Purposes*

Lucas next claims that the district court lengthened his sentence to promote his rehabilitation. In *Tapia v. United States*, 131 S. Ct. 2382 (2011), the Supreme Court held that the Sentencing Reform Act precludes a district court from imposing or lengthening a prison term in order to promote a criminal defendant's rehabilitation. *See* 18 U.S.C. § 3582(a) (instructing sentencing courts to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation"). In so holding, the Court remanded for resentencing because the district court specifically selected the length of the sentence to ensure that the defendant would be eligible to participate in a 500-hour drug-treatment program. *Tapia*, 131 S. Ct. at 2392-93. But the Court also emphasized that it was not error for a district court to

---

[4] (...continued)
(internal citations omitted)). *But see United States v. Durham*, 645 F.3d 883, 898 (7th Cir. 2011) ("[T]he distinction between diminished capacity and personal characteristics that either increase or decrease the risk of recidivism (*i.e.*, aggravating or mitigating factors) is an important one. A finding of diminished capacity should never be treated as an aggravating factor for sentencing purposes.") (*citing Portman*, 599 F.3d at 638).

discuss the opportunities for rehabilitation within prison or the benefits of specific treatment or training programs. *Id.* at 2392. District courts are also permitted to urge the Bureau of Prisons to place an offender in a prison-treatment program. *Id.*

The district court briefly mentioned rehabilitative programs while sentencing Lucas. After imposing a sentence of 210 months, the district court stated that "[s]uch a sentence will serve to hold the defendant accountable, serve as a deterrent, protect the community, provide the opportunity for rehabilitative programs and achieve parity with sentences of similarly-situated offenders." (Sent. Tr. at 32.) The district court concluded by stating: "[H]opefully, too, you can find interest in education and training—all of which I know you plan to pursue while in prison—that will direct you to something better upon your release." *Id.* at 35. Lucas now contends that in making these brief statements, the district court relied on the opportunity for rehabilitation in lengthening Lucas's sentence.

Contrary to Lucas's contention, the district court did what *Tapia* plainly allows: discuss the opportunities for rehabilitative programs while Lucas is imprisoned. As the Supreme Court stated, "[A] court properly may address a person who is about to begin a prison term about these important matters." *Tapia*, 131 S. Ct. at 2392. There is no indication that the district court chose the length of the sentence based upon the greater opportunities for rehabilitation a longer prison sentence allowed. Although "imprisonment is not an appropriate means of promoting

correction and rehabilitation," 18 U.S.C. § 3582(a), the mere mention that Lucas would have the opportunity to take part in rehabilitative programs is not prohibited under *Tapia*.

### E. *Illegality of the Sentence*

Lucas next argues that any sentence above seven years was illegal as a matter of law. Under 18 U.S.C. § 924(c)(1)(A)(ii), a defendant will be "sentenced to a term of imprisonment of not less than 7 years" for brandishing a firearm during and in relation to any crime of violence. Lucas argues that because the statute does not specify a maximum sentence, such as life imprisonment, that the specific sentence of seven years is required and any sentence other than seven years is illegal. We need not spend much time dispensing with this argument.

We have previously stated that "convictions under § 924(c)(1)(A) carry a statutory maximum sentence of life imprisonment, regardless of what subsection the defendant is sentenced under." *United States v. Sandoval*, 241 F.3d 549, 551 (7th Cir. 2001). The Supreme Court came to a similar conclusion while addressing § 924(c)'s mandatory minimum sentences, stating that "[s]ince [§ 924(c)(1)(A)'s] subsections alter only the minimum, the judge may impose a sentence *well in excess of seven years*, whether or not the defendant brandished the firearm." *Harris v. United States*, 536 U.S. 545, 554 (2002) (emphasis added). And the dissent agreed with this particular conclusion by stating, in support of its position that a finding that the defendant brandished a firearm

must be made by a jury, that such a finding changes the "penalty range for a conviction" under § 924(c)(1)(A) from "five years to life in prison" to "seven years to life imprisonment." *Id.* at 575-76 (Thomas, J., dissenting).

Our sister circuits agree, holding that because Congress set out a statutory minimum but not a maximum in § 924(c)(1)(A), it implicitly authorized district courts to impose a sentence up to a maximum of life imprisonment. *See United States v. Shabazz*, 564 F.3d 280, 289 (3d Cir. 2009); *United States v. Johnson*, 507 F.3d 793, 798 (2d Cir. 2007); *United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005); *United States v. Avery*, 295 F.3d 1158, 1170 (10th Cir. 2002); *United States v. Cristobal*, 293 F.3d 134, 147 (4th Cir. 2002); *United States v. Pounds*, 230 F.3d 1317, 1319 (11th Cir. 2000) (per curiam); *United States v. Sias*, 227 F.3d 244, 246 (5th Cir. 2000). Lucas's sentence of 210 months was not illegal because it was below the maximum sentence of life imprisonment.

## F. Substantively Unreasonable

Lucas finally challenges his sentence of 210 months as substantively unreasonable. We review the district court's above-range sentence under an abuse of discretion standard, in light of the sentencing factors of 18 U.S.C. § 3553(a). *See Gall*, 552 U.S. at 51; *United States v. Courtland*, 642 F.3d 545, 550 (7th Cir. 2011). A sentence outside the advisory guidelines range is not presumptively unreasonable; instead, we defer to the sentencing court when "the factors in 18 U.S.C. § 3553(a), when taken as a whole,

justify the extent of the variance from the guidelines." *United States v. Wise*, 556 F.3d 629, 632-33 (7th Cir. 2009). Under this analysis, "the farther the judge's sentence departs from the guidelines[,] the more compelling the justification based on factors in section 3553(a) that the judge must offer in order to enable the court of appeals to assess the reasonableness of the sentence imposed." *Courtland*, 642 F.3d at 550 (internal quotation marks and punctuation omitted). A court's explanation may be sufficient even if not framed in terms of a departure from the guidelines. *Id.*

Lucas argues that the sentence is substantively unreasonable for two reasons. First, he contends that the 210-month sentence for a § 924(c) violation represents such a substantial increase over the applicable guidelines sentence of 84 months that it is unprecedented. As evidence, he points to the Supreme Court's opinion in *United States v. O'Brien*, where Justice Kennedy noted that "most courts impose the mandatory minimum of 7 years' imprisonment for brandishing a nonspecific weapon and the longest sentence that has come to the litigants' or the Court's attention is 14 years." 130 S. Ct. 2169, 2177 (2010). Because the Supreme Court could not identify a case where a defendant received more than a fourteen-year sentence for the same offense, and he received a seventeen-and-one-half-year sentence, Lucas posits that the sentence is substantively unreasonable.

Lucas's contention is unavailing. As discussed above, the maximum sentence for a conviction of § 924(c) is life imprisonment. Lucas's sentence was (obviously)

below this statutory maximum. The fact that we are unable to identify another case where a criminal defendant received a longer term of imprisonment does not render the sentence unreasonable; there must always be a first.

Moreover, Lucas undercuts his own argument by noting the unusual procedural circumstances of his sentence. In most cases, a § 924(c) conviction is accompanied by a conviction for an underlying offense, and the seven-year mandatory minimum under § 924(c)(1)(A)(ii) would operate as a consecutive sentence. A defendant in such a case would necessarily already be facing a sentence greater than seven years without an upward variance from the mandatory minimum sentence for the § 924(c) conviction. And if the sentencing judge decided it was appropriate to increase the defendant's sentence above the aggregate guidelines range for the two offenses, he could do so based on the defendant's conviction for the underlying offense, rather than the § 924(c) conviction. Given this set of circumstances, it is entirely expected that a longer sentence for a conviction of § 924(c) is unusual. But because the underlying conduct of attempted kidnapping was dismissed pursuant to the plea agreement, Lucas was in a different situation from most defendants sentenced under § 924(c).

Second, Lucas argues that, given the magnitude of the variance from the guidelines sentence, the district court failed to offer compelling justification under 18 U.S.C. § 3553(a) for the sentence imposed. We find no merit to this argument because the district court justified its

sentence using the § 3553(a) factors. The district court discussed at length the violent nature of Lucas's offense, which involved a premeditated, meticulous plan to kidnap and harm a minor, as well as Lucas's personal characteristics. The court then noted that at the time of the offense, Lucas was on conditional release in Massachusetts for illegal possession of firearms. The district court also found that the guidelines did not adequately take into consideration the "seriousness of the offense" under § 3553(a)(2) because the relevant conduct in the dismissed count of attempted kidnapping was not otherwise considered under the guidelines sentence. We find the district court offered compelling justification for the sentence it imposed, and the sentence was substantively reasonable.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Lucas's sentence.