In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-3684

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LOVOYNE DRAIN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:11CR00096-001 — **Sarah Evans Barker**, *Judge.*

ARGUED JUNE 13, 2013 — DECIDED JANUARY 21, 2014

Before MANION, SYKES, and TINDER, *Circuit Judges.*

SYKES, *Circuit Judge.* Lovoyne Drain appeals his above-guidelines sentence for possession of a firearm by a felon, 18 U.S.C. § 922(g)(1). He argues that the district judge ran afoul of U.S.S.G. § 4A1.3(a)(3) and the Due Process Clause by considering his record of unadjudicated arrests, many for offenses involving drugs or violence. But § 4A1.3(a)(3), like

every provision of the sentencing guidelines, is advisory. And the judge did not violate Drain's right to due process by taking account of his arrest history as part of her evaluation of the sentencing factors under 18 U.S.C. § 3553(a). Accordingly, we affirm Drain's sentence.

## I. Background

In February 2010 Drain sold a rifle engraved with the warning "Law Enforcement Use Only" to a government informant. The rifle had been stolen from an FBI vehicle a few months earlier. Later, in July 2010, police officers went to Drain's home to execute a warrant for his arrest on charges of dealing cocaine. They observed drug paraphernalia in the home, obtained a search warrant for the residence, and recovered a loaded Beretta 9mm pistol with an obliterated serial number. Drain's fingerprints were found on bullets in the gun's magazine. The officers also discovered seven injured and malnourished pit bulls held in squalid conditions at Drain's residence.

After his arrest Drain confessed to federal agents that he had fired the stolen FBI rifle and knew it belonged to law enforcement, but he insisted that he was only hiding the weapon for an acquaintance. In a later interview, Drain initially denied that he had ever handled the Beretta—or, indeed, that he possessed *any* guns at his residence—but changed his story and said he was holding that gun for a jailed acquaintance. After he was confronted with the fingerprint analysis, Drain admitted loading 9mm ammunition into the Beretta and

bragged that his fingerprints probably are on every gun in Indiana.

Drain was charged with two counts of unlawful possession of a firearm by a felon, *see* 18 U.S.C. § 922(g)(1), and one count of unlawful possession of ammunition by a felon, *see id.* § 924(a)(2). He eventually pleaded guilty to a single violation of § 922(g)(1) based on his possession of the Beretta. The probation officer who drafted Drain's presentence report calculated a total offense level of 18 and a criminal-history category of III, resulting in a guidelines imprisonment range of 33 to 41 months. Drain's criminal-history score did not reflect his 3 juvenile offenses, 6 of his 10 adult convictions, a pending drug case, or 17 unadjudicated arrests since 1993.[1] Accordingly, the probation officer suggested that an "upward departure" under U.S.S.G. § 4A1.3(a)(1) might be appropriate because Drain's criminal-history category understated his extensive criminal conduct, much of which involved drugs or violence. Although the presentence report described the facts underlying Drain's adult convictions and juvenile adjudications, the events underlying the unadjudicated arrests were not described. Drain objected to the probation officer's suggestion, arguing that departures are obsolete after *United*

---

[1] The presentence report identified 10 adult convictions, although several of those were grouped together because they were adjudicated simultaneously. The report listed 20 "other arrests." Two of the arrests resulted in acquittals, and a third was "waived for adult prosecution" (resulting in two of the adult convictions), so by our count Drain has 17 unadjudicated arrests.

*States v. Booker*, 543 U.S. 220 (2005), and that his criminal-history category adequately accounted for his criminal history.

At sentencing the district judge adopted the guidelines calculations from the presentence report without further objection. After Drain's allocution, the judge questioned him at length about his extensive criminal history given his relative youth (33 years old) and about the role drugs have played in his life. We set forth the colloquy at length here because it forms the basis for the arguments Drain raises on appeal.

> THE COURT: One of the complicating factors here is your substantial criminal history, and the fact that you've had obviously so much trouble staying on the straight and narrow.
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: You've had—you've been arrested on 31 separate occasions, which is about one a year since you were born.[2]
>
> THE DEFENDANT: Yes, ma'am.
>
> THE COURT: And you didn't even, I assume, get drawn into criminal behavior till you were a teenager. So you're picking them up twice a year about, right?
>
> THE DEFENDANT: (Witness nodded head.)

---

[2] The district court seems to have miscounted 31 total arrests and 12 since 2008, though both numbers are in the ballpark.

THE COURT: So there's some disconnect that keeps you from living within the law. …

The only thing that society says is conform your behavior to the legal requirements. And you haven't been able to do that. Right?

THE DEFENDANT: Yes, ma'am.

… .

THE COURT: Why isn't this a lesson you've been able to learn for yourself?

THE DEFENDANT: I guess getting caught up in the streets, I guess, and doing the drugs that I was doing.

… .

THE COURT: The presentence report says that marijuana is your drug of choice, an every day pursuit, right?

THE DEFENDANT: Yes, ma'am.

THE COURT: But probably cocaine, too, because you've got a prior conviction for possessing cocaine, right?

THE DEFENDANT: Yes, ma'am.

THE COURT: Where are you getting the money to buy those drugs?

THE DEFENDANT: Doing wrong things.

… .

THE COURT: Selling drugs?

THE DEFENDANT: Yes, ma'am.

THE COURT: So you had to traffic in drugs in order to get enough for yourself, right?

THE DEFENDANT: I guess.

THE COURT: Well, I guess, or is the answer yes?

THE DEFENDANT: Yes.

THE COURT: Is that where you got the money for your drugs?

THE DEFENDANT: Yes.

THE COURT: Were those dogs that were found, those pit bulls that were found on your property, yours?

THE DEFENDANT: Yes.

… .

THE COURT: So you had to buy the dog food?

THE DEFENDANT: Yes, ma'am.

THE COURT: You weren't manufacturing the dog food, were you?

THE DEFENDANT: No, ma'am.

THE COURT: So the money for that came from drugs, right?

THE DEFENDANT: Yes, ma'am.

THE COURT: Did you contribute to the support of your children with food and clothing and that sort of thing or was somebody else having to do that?

THE DEFENDANT: I did.

THE COURT: Was that from drugs?

THE DEFENDANT: Yes, ma'am.

THE COURT: You had a serious problem, didn't you?

THE DEFENDANT: Yes, ma'am.

THE COURT: And actually, that serious problem just runs all the way through your criminal history, doesn't it?

THE DEFENDANT: Yes, ma'am.

… .

THE COURT: [B]asically, you've not ever been employed?

THE DEFENDANT: No, ma'am.

THE COURT: So whatever money you had was from drug dealing, right?

THE DEFENDANT: Yes, ma'am.

… .

THE COURT: Where did you get the [gun] you pled guilty to?

THE DEFENDANT: Off the streets.

THE COURT: I don't know what that means, "off the streets." It sounds like it fell from heaven. Where did it come from, Mr. Drain?

THE DEFENDANT: I bought it off the streets.

THE COURT: You bought it from somebody?

THE DEFENDANT: Yes, ma'am.

… .

THE COURT: It was probably a hundred dollars? Where did you get the hundred dollars?

THE DEFENDANT: Drug money, Your Honor.

… .

THE COURT: Why did you want the gun?

THE DEFENDANT: I guess for protection.

THE COURT: What did you need protection from? Are there wild animals in your neighborhood?

THE DEFENDANT: No, ma'am.

THE COURT: It's for drugs, wasn't it? You're in the drug business. You wanted the gun to protect your drug business because, of course, it's illegal, and you can't call the police if there's some threat. You have to protect yourself, right?

THE DEFENDANT: Yes, ma'am.

… .

THE COURT: Since 2008, according to the presentence report, you've had 12 different arrests, since 2008. And you've been incarcerated two of those years on this, 20 months didn't you say?

THE DEFENDANT: Yes, ma'am.

THE COURT: So just about two years. You were a busy law breaker.

THE DEFENDANT: Yes, ma'am.

THE COURT: Part of what I have to take into account here in fashioning a sentence, Mr. Drain, is what sort of sentence is necessary to protect the public on the chance you don't turn around here.

So it's partly about getting you back in a good condition, but it's also about protecting the public from the behaviors of a person who's shown himself to be nothing but a law violator. That is the consistent pattern: Drug user and law violator.

Defense counsel objected to the court's consideration of Drain's unadjudicated arrests because the presentence report lacked any description of the conduct underlying the 17 unadjudicated arrests. The judge apparently misunderstood and thought counsel was objecting to consideration of *any* of

Drain's arrests, including those that had resulted in convictions. That misunderstanding led to this exchange:

> THE COURT: But he has five felony convictions—
>
> MR. DAZEY: That is certainly fair game.
>
> THE COURT: —among them, and 17 of the arrests, the probation officer has done the calculations so I'm just reading from paragraph 103 of the presentence report, that 17 of the arrests are related to drugs or violent activity.
>
> So I mean it's not "Just 31 arrests, don't pay any attention, Judge," because packed into those 31 separate occasions, including the instant offense, are some troublesome facts.

After this exchange counsel dropped the subject of the unadjudicated arrests.

The government argued for a prison sentence at the top of the guidelines range, noting that the district court had "fairly captured the fact that this number of arrests, even without having some of the facts behind them, speaks in a way that the [c]ourt is entitled to consider with respect to the history and characteristics of this defendant."

Before imposing sentence, the judge addressed the factors in 18 U.S.C. § 3553(a) at some length, eventually concluding that the guidelines range of 33 to 41 months didn't fairly reflect Drain's criminal lifestyle, admitted drug conduct, and violent propensities. The judge also took note of the condition of the

dogs recovered from Drain's residence and his inconsistent statements about how he obtained the Beretta. Finally, the judge stressed that Drain had admitted possessing the stolen FBI rifle and bragged about handling many other firearms. The judge imposed a sentence of 57 months, 16 months above the guidelines range. The judge asked Drain's lawyer if he had any legal objection to the sentence or needed any additional explanation of the reasons behind it; counsel said he did not.

## II. Discussion

On appeal Drain first argues that the district court violated the policy statement in § 4A1.3(a)(3) of the guidelines by relying on his arrest record to impose a sentence above the guidelines range. The government initially responds by arguing that the judge's remarks about Drain's arrests were limited to the colloquy with Drain and did not influence her consideration of the § 3553(a) factors. The government's point is difficult to square with the sentencing transcript. The judge commented on Drain's arrest history before imposing sentence, specifically noting that 17 of his arrests were for offenses that involved drugs or violence and emphasizing his pattern of criminality. We think it's clear that the court took into account Drain's history of unadjudicated arrests in arriving at the above-guidelines sentence.

That doesn't mean that Drain's challenge to his sentence is a winner. The policy statement in § 4A1.3(a)(3) says that "[a] prior arrest record itself shall not be considered for purposes of an upward departure." U.S.S.G. § 4A1.3(a)(3). Acknowledging that the sentencing guidelines are advisory,

*see Booker*, 543 U.S. at 245, Drain nevertheless insists that the sentencing court was required to follow § 4A1.3(a)(3) and refrain from considering his arrest record to impose an above-guidelines sentence. This outcome, he says, is dictated by 18 U.S.C. § 3553(a)(5), which instructs the court to consider the Sentencing Commission's policy statements.

But consideration does not mean adherence. Section 3553(a)(5) does not mandate that the court follow the Commission's policy statements. *United States v. Reyes-Medina*, 683 F.3d 837, 841–42 (7th Cir. 2012); *United States v. Jackson*, 547 F.3d 786, 793 (7th Cir. 2008)*; United States v. Haj-Hamed*, 549 F.3d 1020, 1027 (6th Cir. 2008); *United States v. Martin*, 520 F.3d 87, 93 (1st Cir. 2008); *United States v. Bradford*, 500 F.3d 808, 812 (8th Cir. 2007); *United States v. Bungar*, 478 F.3d 540, 544 (3d Cir. 2007). Like the rest of the guidelines, § 4A1.3(a)(3) is advisory. *United States v. Lucas*, 670 F.3d 784, 791 (7th Cir. 2012); *United States v. Johnson*, 612 F.3d 889, 896 (7th Cir. 2010); *Jackson*, 547 F.3d at 793. Indeed, as a policy statement, § 4A1.3(a)(3) has always been nonbinding, and after *Booker* a policy statement is " 'intended to be given even less consideration by sentencing judges.' " *Reyes-Medina*, 683 F.3d at 841–42 (quoting *United States v. Robertson*, 648 F.3d 858, 859 (7th Cir. 2011)). Certainly a sentencing judge may choose to follow those policy statements post-*Booker* as a part of the § 3553(a) analysis, *Lucas*, 670 F.3d at 791; *Johnson*, 612 F.3d at 896, but the failure to do so is not grounds for reversal.[3]

---

[3] In his reply brief, Drain argues that the district court's failure to follow § 4A1.3(a)(3) "prevented the proper calculation of the guideline range."

(continued...)

Drain also argues that the district court violated his Fifth Amendment right to due process by sentencing him based on unfounded speculation that his unadjudicated arrests stemmed from actual criminal activity. Due process requires that courts base their sentencing decisions on reliable information. *Lucas,* 670 F.3d at 792. In *United States v. Guajardo-Martinez*, 635 F.3d 1056 (7th Cir. 2011), we noted that considering unadjudicated arrests "can present a due process problem if the arrests do not reflect reliable information of wrongdoing." *Id.* at 1059. After all, an arrest alone does not necessarily mean guilt. *United States v. Terry*, 930 F.2d 542, 546 (7th Cir. 1991). Citing § 4A1.3(a)(3), we said in *Guajardo-Martinez* that "[a] sentencing court may not rely on the prior arrest record itself in deciding on a sentence or in imposing an upward departure."[4] 635 F.3d at 1059.

---

[3] (...continued)
That contention is frivolous. Section 4A1.3 concerns sentencing *outside* the guidelines range and has nothing to do with the calculation of the range. *See* U.S.S.G. § 4A1.3 cmt. background ("This policy statement authorizes the consideration of a departure from the guidelines … .").

[4] This reference to "imposing an upward departure" is a throwback to old usage when the guidelines were mandatory. We reiterate, as we have many times before, that "formal departure analysis is obsolete." *United States v. Brown*, 732 F.3d 781, 786 (7th Cir. 2013). The district court "can still take guidance from the departure provisions and apply them by way of analogy when assessing the § 3553(a) factors." *United States v. Lucas*, 670 F.3d 784, 791 (7th Cir. 2012). But "analogizing to departures is just one way for the district court to explain a sentence; it has no legal force or effect." *Brown*, 732 F.3d at 786.

But we have also held that a substantial history of arrests, especially if they are similar to the offense of conviction, can be a reliable indicator of a pattern of criminality, suggesting a recidivism risk, and may be considered in weighing the sentencing factors under § 3553(a). *See United States v. Lopez-Hernandez,* 687 F.3d 900, 904 (7th Cir. 2012) (41 similar arrests); *United States v. Walker*, 98 F.3d 944, 948 (7th Cir. 1996) (23 similar arrests). *But see United States v. Johnson*, 648 F.3d 273, 278 (5th Cir. 2011) (concluding that five similar arrests, without the underlying facts, were not indicative of actual guilt); *United States v. Berry*, 553 F.3d 273, 284 (3d Cir. 2009) (concluding that a "couple" of minor arrests did not suggest actual guilt); *United States v. Zapete-Garcia*, 447 F.3d 57, 61 (1st Cir. 2006) (concluding that a single prior arrest was improperly considered). Drain had adult convictions for possessing cocaine and marijuana, carrying a gun, and resisting law enforcement. He also had juvenile adjudications for battery. Thirteen of the unadjudicated arrests were for those very crimes, and Drain does not dispute that the arrests occurred; nor does he challenge their factual basis. This arrest history thus makes Drain's case one of those "situations where the number of prior arrests, and/or the similarity of prior charges to the offense of conviction, becomes so overwhelming and suggestive of actual guilt that they become exceedingly difficult to ignore." *Berry*, 553 F.3d at 284, *cited with approval in Lopez-Hernandez*, 687 F.3d at 904.

During oral argument, Drain's counsel suggested that a statement in *Lopez-Hernandez* supports his position that the policy statement in § 4A1.3(a) applies to all above-guidelines sentences. In that case we observed that § 4A1.3(a) by its terms

does not apply to sentences within or below the guidelines range. *Lopez-Hernandez*, 687 F.3d at 903. We do not see how this statement helps Drain. As we have repeatedly explained, the departure provisions in Chapter 4 of the guidelines manual are no more binding on the sentencing court than any other provision in the guidelines. *See Lucas*, 670 F.3d at 791; *Jackson*, 547 F.3d at 793. We review *all* sentences—whether above, within, or below the recommended guidelines range—for reasonableness under a deferential abuse-of-discretion standard. *See Jackson*, 547 F.3d at 792.

The sentencing court did not abuse its discretion here. Although the presentence investigation report did not describe the underlying facts of the unadjudicated arrests, the district court could reasonably rely on Drain's long arrest record in combination with his adjudicated criminal history as a part of its holistic evaluation of the § 3553(a) factors. The relevance and reliability of the arrest record was bolstered by Drain's own acknowledgement at sentencing that he had a long and unbroken history of criminal conduct.

In his colloquy with the judge, Drain admitted that drug dealing had been his sole livelihood as an adult, that drug use had been an "every day pursuit," and that he acquired his guns to protect his drug business. These admissions supplied an adequate factual predicate for the court to consider the string of arrests, among all the other sentencing factors, to arrive at a reasonable sentence. *See United States v. Ruzzano*, 247 F.3d 688, 698 (7th Cir. 2001) ("Although the district court did refer to Ruzzano's investors as 'victims,' this was not improper because Ruzzano admitted committing fraud in the plea agreement.");

*Terry,* 930 F.2d at 545 ("Examples of reliable information of criminal conduct not resulting in a conviction include admissions by the defendant that he committed criminal acts for which he was never charged … ."). Collectively, this information allowed the court to draw a reliable negative inference about his risk of recidivism. *See Lopez-Hernandez,* 687 F.3d at 903.

AFFIRMED.